UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.                                                                        5:16-CR-0244
                                                                            (GTS)
MICHAEL CARAHER,

                                        Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

HON. RICHARD S. HARTUNIAN              EMMET J. O'HANLON, ESQ.
United States Attorney for the N.D.N.Y.       Assistant United States Attorney
   Counsel for the Government
100 South Clinton Street
Syracuse, NY 13261

HON. LISA A. PEEBLES                          RANDI BIANCO, ESQ.
Federal Public Defender for the N.D.N.Y.   Assistant Federal Public Defender
   Counsel for Defendant
4 Clinton Square, 3rd Floor
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this criminal prosecution of Michael Caraher

("Defendant") for receipt, possession, distribution and attempted distribution of child

pornography, are the following five motions by Defendant: (1) a motion to dismiss the

Indictment, (2) a motion for a bill of particulars, (3) a motion to compel discovery, (4) a motion

to suppress statements, and (5) a motion to suppress evidence.  (Dkt. Nos. 23, 24, 25, 26 and 27.)

The Government has opposed Defendant's motions.  (Dkt. Nos. 34, 35, 36, 37 and 38.)  For the

reasons set forth below, Defendant's five motions are denied.

I.      **RELEVANT BACKGROUND**

The Federal Bureau of Investigation ("FBI") conducted an investigation known as "Operation Pacifier" into a child pornography website called "Playpen," which operates on an anonymous network known as "The Onion Router" or "Tor."  (Dkt. No. 36 at 3.)[1]  The Tor network is designed for confidentiality and protects the identifying information of its online users, such as their the Internet Protocol ("IP") addresses.  (Dkt. No. 27-1 at 4-5.)  Websites such as Playpen operate as "hidden services" on the Tor network, concealing the IP address of the hosting computer to make discovery of the website difficult.  (Dkt. No. 34 at 5-6.)

On February 19, 2015, the FBI apprehended the administrator of Playpen and seized control of the website.  (*Id*. at 23.)  The FBI moved Playpen's server to a facility in Virginia, where it continued to operate and monitor the website for approximately two weeks.  (Dkt. No. 27-1 at 5-6.)  On February 20, 2015, the FBI applied to a U.S. magistrate judge in the Eastern District of Virginia for a "Network Investigate Technique" Warrant ("NIT Warrant").  (*Id*. at 6-10.)

In describing the website to the U.S. magistrate judge, the FBI agent relied on, among other things, the homepage's appearance when he reviewed the website on February 18, 2015, two days before he signed the affidavit.  (Dkt. No. 27-1 at 8-9; Dkt. No. 34 at 22-23.)  The original homepage depicted an image of two partially clothed, prepubescent girls with their legs spread.  (Dkt. No. 42-1 at 2.)  At some point before being apprehended on February 19, 2015, Playpen's administrator changed the image of the homepage to a singular picture of one young

---

[1]      Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the parties' respective motion papers.

girl, whose exact age is unclear, wearing a short dress and black stockings with her legs crossed. (Dkt. No. 42-2 at 2.)  The affidavit also described in great detail background information about the Tor network, the concealment of the Playpen website and its users, the content of Playpen, and the necessity of using the NIT to identify the users.  (Dkt. No. 42-4.)

On February 20, 2015, after her determination that probable cause existed, the U.S. magistrate judge issued the NIT warrant, authorizing the FBI to deploy the NIT on the server located in the Eastern District of Virginia.  (Dkt. No. 34 at 8.)[2]  The NIT was designed to obtain specific identifying information from any computer that logged into Playpen, including the user's IP address.  (Dkt. No. 27-1 at 6-10; Dkt. No. 34 at 7-9.)[3]

---

[2]     The NIT Warrant application described the "Place to be Searched" as any computers that activate the Playpen server in the Eastern District of Virginia, which included either users or administrators who logged onto Playpen by entering a username and password. (Dkt. No. 42-4 at 38; NIT Warr. Attachment A.)

[3]     The NIT Warrant described the "Information to be Seized" from the activating computers as follows:

1.      [T]he "activating computer's actual IP address, and the date and time that the NIT determines what that IP address is;
2.      [A] unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other "activating" computers, that will be sent and collected by the NIT;
3.      [T]he type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g. X 86);
4.      [I]nformation about whether the NIT has already been delivered to the "activating" computer;
5.      [T]he "activating" computer's Host Name;
6.      [T]he "activating" computer's active operating system username; and
7.      [T]he "activating" computer's media access control ("MAC") address.

(Dkt. No. 42-4; NIT Warr. Attachment B.)

With the use of this NIT, the FBI identified hundreds of IP addresses of Playpen users from across the country, resulting in numerous federal child pornography cases.  (Dkt. No. 34 at 9.)[4]  The NIT discovered that one username, "Phillip J. Fry," had an IP address in Morrisville, New York.  (Dkt. No. 27-1 at 10-11.)  This information was sent to the FBI's Albany Division.  (Dkt. No. 34 at 9.)  Further investigation led FBI agents to apply for a residential search warrant of Defendant's home.  (*Id*.)  On January 19, 2016, U.S. Magistrate Judge Andrew T. Baxter of the U.S. District Court for the Northern District of New York issued a residential search warrant, authorizing a search of, among other things, Defendant's home, person, and electronic media.  (Dkt. No. 34-1.)

On January 28, 2016, FBI agents executed the residential search warrant.  (Dkt. No. 27-1 at 11.)  The team executing the search included approximately ten FBI agents, three New York State Police troopers, and one task force officer.  (Dkt. No. 38 at 4.)  The search resulted in the seizure of several computers, hard drives, cellular phones, electronic media, and printed pages of child erotica.  (Dkt. No. 27-1 at 11; Dkt. No. 34 at 10.)  At some point during the search, two FBI agents left with Defendant to go speak at the Morrisville police substation, where Defendant made incriminating oral and written statements, and participated in a polygraph examination.  (Dkt. No. 26-1 at 2-4; Dkt. No. 38 at 4-7.)

On August 10, 2016, Defendant was indicted by a grand jury of the following: distribution and attempted distribution of child pornography, in violation of 18 U.S.C. §

---

[4]      Because this Decision and Order is intended primarily for review by the parties, this Court assumes the reader's familiarity with all of the underlying facts involved in this investigation.  The Court notes that, in other Operation Pacifier cases from across the country, courts have issued decisions regarding issues similar to those in this action.  A listing of those cases can be found in the parties' briefs.  (Dkt. No. 34 at 12-13; Dkt. No. 42 at 13-14.)

2252A(a)(2)(A) & (b)(1), receipt of child pornography, in violation of 18 U.S.C. §

2252A(a)(2)(A), and possession of child pornography, in violation of 18 U.S.C. §

2252A(a)(5)(B).  (Dkt. No. 13.)

On March 28, 2017, a suppression hearing was held to determine the admissibility of the

Defendant's statements that he made while at the police substation.  (Dkt. No. 55.)  The

Government called four FBI special agents: Peter Fitzgerald, Robert Lyons, Melissa Lewis, and

Alexander McDonald.  (*Id.*)  Generally, the four Government witnesses testified about their

involvement executing the search warrant at Defendant's house, their involvement with regard to

the interview of Defendant at the police station, and/or their involvement with the polygraph

examination.  (*Id.*)  Government Exhibits G-1 through G-5 (which included a diagram of

Defendant's house, screenshots of the Playpen website, a signed consent-to-polygraph form, a

signed advice-of-rights form, and a signed statement from Defendant) were all marked and

admitted into evidence.  (Dkt. No. 53.)  Defendant called Eric Caraher, his father, as his only

witness.  (Dkt. No. 55.)  Generally, Eric Caraher testified about his observations during the

execution of the search warrant at Defendant's home.  (*Id.*)[5]

## II.    PARTIES' BRIEFING ON DEFENDANT'S MOTIONS

### A.      Briefing on Defendant's Motion to Dismiss the Indictment

#### 1.      Defendant's Memorandum of Law

Generally, Defendant argues that his Indictment should be dismissed because the

Government engaged in "extreme and outrageous conduct" during its investigation.  (Dkt. No.

---

[5]      Defendant did not testify at the hearing.  Because Defendant was not subject to cross-examination at the hearing, the Court will not credit Defendant's pre-hearing affidavit testimony over the agents' hearing testimony, to the extent that Defendants' affidavit testimony conflicts with the agents' hearing testimony.

23-1 at 3-6.)[6]  More specifically, Defendant argues that the FBI's continued operation of "Playpen" made the FBI "a child pornography distributor . . . vitimiz[ing] untold thousands of children in the process by hosting and distributing images of their abuse."  (*Id*. at 3.)[7]  Thus, Defendant argues that, by "stimulating and facilitating the demand" for child pornography, the Government has engaged in "extreme and outrageous conduct" which requires the Indictment to be dismissed.  (*Id*. at 4.)  Moreover, Defendant argues that the FBI's conduct has caused continued victimization, and that, if the Court allows the indictment to stand, it will send a message to the FBI that this conduct is allowable.  (*Id*. at 5-6.)

In further support of his position, Defendant cites to two other cases involving child pornography investigations, stressing that, in those cases, the government never allowed the defendants to redistribute or copy the pornographic material.  (Dkt. No. 23-1 at 8-9.)  Defendant argues that those cases, in which the courts held that the government's conduct was *not* extreme and outrageous, are notably distinguishable from this case because the FBI investigation here allowed the child pornography to be printed, copied, and redistributed "out into the world where untold thousands will get to victimize the subjects by watching their abuse."  (*Id*.)  Defendant argues that, "[i]f this is not extreme and outrageous, then nothing is."  (*Id*. at 9.)

Finally, Defendant argues that Congress has passed several laws that prevent the FBI from distributing child pornography both outside of the Government and within the criminal

---

[6]  Defendant distinguishes his claim from an entrapment defense, emphasizing that the due process violation alleged here "turn[s] on whether the governmental conduct, standing alone, is so offensive that is "'shocks the conscience.'"  (Dkt. No. 23-1 at 7 [citing *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991)].)

[7]  Indeed, Defendant argues that the perpetual victimization of children is often referenced by the Government when it expresses concerns with the proliferation of child pornography.  (Dkt. No. 23-1 at 5-6.)

court system. (Dkt. No. 23-1 at 9-10.) Thus, by monitoring "Playpen" and allowing it to operate for over two weeks, Defendant argues that the FBI actions directly violated these laws. (*Id*.) These violations, Defendant argues, also provide sufficient reasons to dismiss the Indictment based on the Government's "extreme and outrageous conduct." (*Id*.)

### 2. Government's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, the Government argues that Defendant's motion to dismiss should be denied for five reasons. (Dkt. No. 36.)

First, the Government argues that the FBI's conduct does not meet the high standard for "extreme and outrageous conduct." (*Id*. at 4.) In support of this argument, the Government points out that every single court handling an Operation Pacifier case that has considered this same motion to dismiss has denied that motion. (*Id*. at 6.) To further demonstrate Defendant's "heavy burden," the Government argues that the Second Circuit has never dismissed an indictment based on a claim of "extreme and outrageous conduct." (*Id*.)

Second, the Government argues that the FBI's actions were necessary to address the problems associated with child pornography. (Dkt. No. 36 at 7-9.) More specifically, the Government argues that identifying users was problematic because of the special technology used to conceal a Playpen user's identity and location. (*Id*.) Therefore, the Government argues that the FBI's brief, continued operation of Playpen was necessary in order for the agents to identify the website users. (*Id*. at 8-9.) Indeed, the Government argues that, as a result of the FBI's action, Operation Pacifier has led to the identification or recovery of thirty-eight child victims. (*Id*. at 9.)

Third, the Government distinguishes the cases cited by Defendant.  (Dkt. No. 36 at 9.)
The Government argues that, in those cases, law enforcement already knew the identity of the
defendants they were investigating, whereas in the current case the NIT investigation was
necessary because Defendant and others took affirmative measures to try and conceal their
identities.  (*Id*. at 9.)  Furthermore, in response to Defendant's argument that the FBI's
investigation allowed Defendant and others to disseminate pornographic material, the
Government argues that, as soon as Defendant was identified by law enforcement, it executed a
residential search warrant and seized all electronic devices containing child pornography to
prevent further dissemination.  (*Id*. at 9.)

Fourth, the Government argues that the FBI took no affirmative steps to induce or further
Defendant's (or any third party's) action in committing a crime.  (*Id*. at 9-10.)  The Government
argues that, to the contrary, the FBI agents actually took steps to mitigate the risk of harm to
third parties.  (Dkt. No. 36 at 10.)  Further, the Government argues that the FBI's brief,
administrative control over Playpen was necessary to allow the NIT to have an opportunity to
work, and that this necessity does not meet the standard for "extreme and outrageous conduct."
(*Id*. at 10-11.)

Finally, the Government argues that Defendant's reliance on *United States v. Chin*, 934
F.2d 393 (2d Cir. 1991), is misplaced.  (*Id*.)  The Government points out that in *Chin*, a case in
which undercover agents encouraged the defendant to buy child pornography, the Second Circuit
found that such actions by the agents did *not* amount to a due process violation of rights of third
parties–specifically the stimulation of demand for child pornography–because the defendant did

not establish that the agents were responsible for his actions.  (*Id*.)[8]  Therefore, the Government

argues that, because the FBI agents here took no action whatsoever to encourage users (including

Defendant) to log on and use Playpen, Defendant is unable to prove that the FBI agents are

responsible for his actions.  (*Id*. at 11-12.)[9]

### 3. Defendant's Reply Memorandum of Law

Defendant did not file a reply memorandum of law, and the deadline by which to do so

has expired.  (*See generally* Docket Sheet.)

### B. Briefing on Defendant's Motion for a Bill of Particulars

### 1. Defendant's Memorandum of Law

Generally, in his motion for a bill of particulars, Defendant requests that the Government

provide him the following information: (1) four categories of information with regard to Count 1

(alleging the distribution and attempted distribution of child pornography); (2) five categories of

information with regard to Count 2 (alleging the receipt of child pornography); (3) five

categories of information with regard to Count 3 (alleging the receipt of child pornography); (4)

four categories of information with regard to Count 4 (alleging the receipt of child pornography);

---

[8]      A necessary prerequisite for demonstrating that an undercover investigation
violated the rights of third parties is proof that the government action actually caused the
defendant to commit a crime that would otherwise have not been committed.  (Dkt. No. 36 at 10
[citing *Chin*, 934 F.2d at 400].)

[9]      The Government also clarifies the partial quote of *Chin* provided by Defendant,
noting the quote is not "[t]he stimulation of demand for child pornography [] is sufficient to
constitute a due process violation," but rather is, "[b]ecause Chin cannot establish that
government agents were responsible for his purchase and importation of illicit magazines, we
need not decide whether the harm his crime inflicted on third parties–specifically, the stimulation
of demand for child pornography–is sufficient to constitute a due process violation."  (Dkt. No.
36 at 12.)

and (5) three categories of information with regard to Counts 5 through 8 (alleging the possession of child pornography).  (Dkt. No. 24-1.)

### 2.    Government's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, the Government argues that the Court should deny Defendant's motion for the following reasons: (1) with regard to Count 1, the first category of requested information was provided on page 11 of the Report of Examination (of September 15, 2016), the second category of information was provided on page 12 of that Report, the third category of information is available for inspection pursuant to 18 U.S.C. § 3509(m), and the fourth category of information is beyond the scope of Fed. R. Crim. P. 7(f); (2) with regard to Count 2, the first category of requested information was provided on page 11 of the Report, the second category of information was provided on page 12 of the Report, the third and fourth categories of information are available for inspection pursuant to 18 U.S.C. § 3509(m), and the fifth category of information is beyond the scope of Fed. R. Crim. P. 7(f); (3) with regard to Count 3, the first category of requested information was provided on pages 7, 9 and 10 of the Report or is available for inspection pursuant to 18 U.S.C. § 3509(m), the second category of  information was provided on pages 7, 9 and 10 of the Report, the third and fourth categories of information are available for inspection pursuant to 18 U.S.C. § 3509(m), and the fifth category of information is beyond the scope of Fed. R. Crim. P. 7(f); (4) with regard to Count 4, the first category of requested information was provided on pages 7, 10 and 11 of the Report, the second and third categories of information are available for inspection pursuant to 18 U.S.C. § 3509(m), and the fourth category of information is beyond the scope of Fed. R. Crim. P. 7(f); and (5) with regard to Counts 5 through 8, the first category of requested information was

provided on pages 7 through 10 of the Report or is available for inspection pursuant to 18 U.S.C.
§ 3509(m), the second category of information is available for inspection pursuant to 18 U.S.C. §
3509(m), and the third category of information is beyond the scope of Fed. R. Crim. P. 7(f).
(Dkt. No. 37.)

### 3.    Defendant's Reply Memorandum of Law

Defendant did not file a reply memorandum of law, and the deadline by which to do so
has expired.  (*See generally* Docket Sheet.)

### C.    Briefing on Defendant's Motion to Compel Discovery

### 1.    Defendant's Memorandum of Law

Generally, in his motion to compel discovery, Defendant requests an Order directing the
Government to disclose, pursuant to Fed. R. Cr. P. 16 and *Brady*, the material requested in his
discovery-request letters of April 15, 2016, August 30, 2016, and September 8, 2016, which
material is relevant and favorable to his pending motion to suppress, motion for a *Franks*
Hearing, and defense at trial, and which includes but is not limited to the following: (1)
information regarding "Operation Pacifier" and "Website A," and particularly the time line and
details of the Government's investigation; (2) information regarding the NIT code and whether it
was available to the general public, as well as a screen shot of the homepage of Playpen as it
appeared between February 20, 2015, and March 4, 2015, and a screen shot of the homepage as
it appeared before February 20, 2015; and (3) information regarding usage statistics of "Website
A" and the FBI's administration of the website.  (Dkt. No. 25-1.)

More specifically, in defense counsel's affirmation,[10] she specifies the twenty-two pieces of information that Defendant seeks: (1) the computer code used by the FBI to access "activating" or "target computers"; (2) whether that code, or a code with similar functionality, is available to the general public; (3) whether the use of such code against a private or government computer without authorization would constitute a federal offense; (4) a screenshot of the "target website's" (Playpen's) homepage or login page as it appeared between February 20, 2015, and March 4, 2015; (5) a screenshot of the "target website's" (Playpen's) homepage or login page as it appeared before February 20, 2015, and March 4, 2015; (6) the manner in which law enforcement first discovered Playpen and the details of that Investigation; (7) whether the investigation involved Tor or proxy server browsers or whether it used standard web browsers; (8) the details of what administrative functions the Government performed while operating the Playpen website, i.e., did it increase or decrease storage capacity, improve or diminish functionality, advertise or promote the website in any way, etc.; (9) whether visitors to "Website A" were able to access child pornography ("CP") while the website was under the administrative control of the FBI; (10) whether the FBI, or other agency controlling the website, posted new content to the website while it was under its administrative control; (11) whether the FBI, or other agency controlling the website, allowed other users to post new content to the website; (12) what content, if any, other users posted while the website was under the administrative control of the FBI; (13) the number of CP pictures that were posted on "Website A" between February 20, 2015, and March 4, 2015; (14) the number of CP videos that were posted in that time; (15) the

---

[10]        In the future, defense counsel is respectfully reminded to restrict legal argument and requests for relief to her memoranda of law, not affidavits or declarations, lest they be overlooked by opposing counsel and/or the Court.

number of links to CP pictures and videos that were posted on "Website A" during that time;

(16) the number of CP pictures that were viewed and the number of CP videos that were viewed

during that time; (17) the number of CP pictures that were downloaded and the number of CP

videos that were downloaded during that period; (18) the number of visitors to the site between

February 20, 2015, and March 4, 2015; (19) some measure of the average length of the visits and

what was viewed; (20) a summary of any measures that were taken by the FBI or other law

enforcement entities to block access to the pictures, videos and links which were available

during that period; (21) the reason the site was shut down on March 4, 2015, rather than later or

earlier; and (22) all documents relating to the review and authorization of the FBI's

administrative control of the site by the Department of Justice or other governmental agencies

that were involved in the "Website A" investigation and deployment of the NIT in this case.

(Dkt. No. 25-2.)

### 2.    Government's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, the Government argues that

Defendant's motion to compel should be denied for the following reasons: (1) with regard to the

first piece of information sought by Defendant, the Government will provide the "payload"

portion of the NIT code, the information collected by the NIT, the two-way network data stream

between Defendant's computer and the Government's computer, and the computer code used to

general unique identifiers related to the NIT; (2) the second piece of information sought by

Defendant is not material to the Government's case-in-chief or any of Defendant's motions or

defense articulated therein; (3) he third piece of information is not material to the Government's

case-in-chief or any of Defendant's motions or defense articulated therein; (4) the fourth piece of

information is provided in the attached Exhibit 6; (5) the fifth piece of information is provided in the attached Exhibit 7; (6) the sixth piece of information was provided in the affidavit in support of the NIT search warrant, is provided in the attached Exhibit 8, or is not subject to disclosure pursuant to Fed. R. Crim. P. 16(a)(2); (7) the seventh piece of information was provided in the NIT search warrant or is provided in the attached Exhibit 8; (8) the eighth piece of information is provided in Exhibit 2 to the Government's response to Defendant's motion to suppress evidence; (9) the ninth piece of information is provided in Exhibit 2 to the Government's response to Defendant's motion to suppress evidence; (10) the tenth piece of information is provided in Exhibit 2 to the Government's response to Defendant's motion to suppress evidence; (11) the eleventh piece of information is provided in Exhibit 2 to the Government's response to Defendant's motion to suppress evidence; (12) the twelfth piece of information is provided in Exhibit 2 to the Government's response to Defendant's motion to suppress evidence; (13) the thirteenth piece of information is provided on pages 10 and 11 of the Government's opposition memorandum of law; (14) the fourteenth piece of information is provided on pages 10 and 11 of the Government's opposition memorandum of law; (15) the fifteenth piece of information is provided on pages 10 and 11 of the Government's opposition memorandum of law; (16) the sixteenth piece of information is provided on pages 12 and 13 of the Government's opposition memorandum of law; (17) the seventeenth piece of information is provided on pages 12 and 13 of the Government's opposition memorandum of law; (18) the eighteenth piece of information is provided on page 13 of the Government's opposition memorandum of law; (19) the nineteenth piece of information is provided on page 13 of the Government's opposition memorandum of law; (20) the twentieth piece of information is provided on pages 13 and 14 of the Government's

opposition memorandum of law (to the extent that it is not protected from disclosure by a qualified law-enforcement privilege); (21) the twenty-first piece of information is provided on pages 14 through 17 of the Government's opposition memorandum of law and in the attached Exhibit 8; and (22) the twenty-second piece of information was provided in the NIT search warrant, is provided in the attached Exhibit 8, is provided in pages 17 and 18 of the Government's opposition memorandum of law, or is not subject to disclosure pursuant to Fed. R. Crim. P. 16(a)(2).  (Dkt. No. 35.)

### 3.      Defendant's Reply Memorandum of Law

Defendant did not file a reply memorandum of law, and the deadline by which to do so has expired.  (*See generally* Docket Sheet.)

### D.      Briefing on Defendant's Motion to Suppress Statements

### 1.      Defendant's Memorandum of Law

Generally, in his motion to suppress statements, Defendant argues that his un-Mirandized statements to agents should be suppressed because they were a product of a custodial interrogation.  (Dkt. No. 26-1.)  More specifically, Defendant argues that, under established case law, he was in custody from the moment he was ordered to place his hands on the railing outside his bedroom door to the end of the questioning he received at the police barracks, because no reasonable person in Defendant's position would have felt free to leave in that situation.  (*Id.* at 5-8.)  In support of this argument, Defendant argues that, under the totality of the circumstances, most of the factors to be considered weigh in favor of concluding that Defendant was in custody.

15

(*Id*. at 5-6.)[11]  Defendant also points to the "police dominated, custodial environment" created by the FBI agents when they took control of his home while executing the search warrant, and the fact that he was isolated from his other family members.  (*Id*. at 6-8.)

Alternatively, Defendant argues that custody began at the moment he was confronted with evidence against him during his questioning at the police barracks.  (Dkt. No. 26-1 at 8.) Because he was subjected to a focused line of questions about his internet activities involving child pornography, as well as confronted with screen shots of his alleged activity on Playpen, Defendant argues that no reasonable person would have felt free to stop the questioning and leave the interview room.  (*Id*.)  Furthermore, Defendant argues that his arrest at the conclusion of the interview is objective evidence that supports his reasonable belief that he was not free to leave.  (*Id*.)

Accordingly, Defendant argues that, under either situation, the facts demonstrate that he was in custody, and therefore should have been informed of his *Miranda* rights.  (*Id*. at 5-8.) Because he was not read his *Miranda* rights, Defendant argues that the statements he made to the FBI agents should be suppressed.  (Dkt. No. 26-1 at 9.)

## 2. Government's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, the Government argues that Defendant's motion to suppress statements should be denied for four reasons.  (Dkt. No. 38.)[12]

---

[11]     These factors include the following: (1) whether the suspect is told he is free to leave; (2) the location and atmosphere of the interrogation; (3) the language and tone used by the police; (4) whether the suspect is searched, frisked, or patted down; and (5) the length of the interrogation.  (Dkt. No. 26-1 at 5 [citing *Tankleff v. Senkowski*, 135 F. 3d 235, 244 (2d Cir. 1998)].)

[12]     The Government notes that Defendant's motion does not seek to suppress the Mirandized statements he gave before his polygraph examination, nor does the motion seek to suppress the signed statement he gave to the FBI agents following his polygraph examination. (Dkt. No. 38 at 3.)

First, the Government argues that determining whether an individual is in custody is an objective test, and that, under the totality of the circumstances, a reasonable person in Defendant's position would not believe he was in custody.  (*Id*. at 8-9.)  In support of this argument, the Government highlights the fact that Defendant voluntarily chose to travel with the FBI agents to the local police station, was told he was not required to speak to the FBI agents, and was provided with the option to either stay in the house during the search or go somewhere more private.  (*Id*. at 10.)

Second, the Government argues that confronting Defendant with incriminating evidence during the interview does not convert the interview into a custodial interrogation.  (*Id*. at 10-11.) The Government argues that, under the *Tankleff v. Senkowski* case cited by Defendant, the fact that a suspect was confronted with incriminatory evidence is not the sole factor in the court's determination that custody existed; rather, the court also considers the totality of circumstances, such as the length of time of the interview and the "increasingly hostile" questioning.  (Dkt. No. 38 at 10-11.)

Third, the Government highlights factors that it argues weigh in favor of finding Defendant's interview was not a custodial interrogation, such as the short length of time of the interview, the agents' tone of voice, the lack of any ruse or ploy to encourage Defendant to agree to speak with them, and the fact that the FBI agents told Defendant he was free to leave and was not required to speak with any of them.  (*Id*. at 11.)

Finally, in the alternative, the Government does not oppose Defendant's request for an evidentiary hearing to determine the admissibility of the un-Mirandized statements based on the competing factual assertions contained in Defendant's and the FBI agents' respective affidavits. (Dkt. No. 38 at 12; Dkt. No. 38-1; Dkt. No. 26-2.)

17

### 3. Defendant's Reply Memorandum of Law

Generally, in his reply memorandum of law, Defendants argues that *all* of his statements should be suppressed because they were the product of an unconstitutional custodial interrogation. (Dkt. No. 43.) In support of this argument, Defendant restates his initial argument, namely that the factors outlined by the Second Circuit weigh in his favor concerning the custody analysis. (*Id*. at 2-12.) In addition, Defendant argues that the Government employed a two-step interrogation technique, rendering his subsequent statements inadmissible notwithstanding his later waiver of his *Miranda* rights and consent to a polygraph test. (*Id* at 12-17.)

With regard to "whether the suspect is or is not told that she is free to leave," Defendant argues that, despite being told he was free to leave by one agent, a second agent told him to wait upstairs by the table. (*Id*. at 4-5.) Additionally, Defendant argues that he was isolated from his family once the FBI agents entered his house. (Dkt. No. 43 at 5.) Defendant argues that these two different statements, coupled with the agents' action to separate Defendant from his father and brother, who remained downstairs during the search, would compel a reasonable person in Defendant's situation to believe that he was not free to leave. (*Id*. at 5.)

Concerning the location and atmosphere of the interrogation, Defendant argues that the facts of his case distinguish his circumstances from those in the cases cited by the Government. (*Id*. at 5-8.) Particularly, Defendant notes the length of time of his interview, the location in a private room at a police station, the presence of two officers, and the fact that he was transported to the police station in the back of an FBI vehicle. (*Id*.) These factors, Defendant argues, weigh in favor of concluding he was in custody. (Dkt. No. 43 at 5-8.)

With regard to "whether the subject was searched or patted down," Defendant argues it is undisputed that he was patted down before getting into the FBI vehicle; and the Government's contention that it was a "brief" pat-down is of no legal significance.  (*Id*. at 8.)

In evaluating whether Defendant voluntarily went to the police station with the FBI agents, Defendant argues that several factual discrepancies are worth noting between his case and those cited by the Government.  (*Id*. at 9-10.)  Defendant argues that only one of those three cases involved the police approaching the suspect in person.  (*Id*. at 9.)[13]  Further, in that case, two police officers rang the suspect's doorbell and asked him to come to the police station.  (Dkt. No. 43 at 9.)  Here, on the other hand, Defendant argues he was surrounded by fourteen federal agents executing a search warrant on his house, room, and personal belongings.  (*Id*.)  As a result, Defendant argues his "agreement" to go to the police station was not voluntary, especially in comparison to the cases cited by the Government.  (*Id* at 9-10.)

Next, Defendant argues that being confronted with evidence is "an extremely relevant factor" for the custody analysis.  (*Id*. at 10.)[14]  Defendant cites the Second Circuit case *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998), for this proposition.  (*Id*. at 10-11.)[15]

Finally, Defendant argues that the initial, illegal interview of Defendant tainted his

---

[13]     In the two other cases, the suspect was requested to meet with government officials either by letter or by telephone.  (Dkt. No. 43 at 9.)

[14]     Defendant is again arguing that if the Court does not find he was in custody when first confronted by FBI agents in his house, that the Court should nevertheless find that he was in custody once he was presented with the print-out images of his alleged online activity during the interview.  (Dkt. No. 43 at 10.)

[15]     Defendant also provides an analysis of whether the FBI agents' questioning constituted an "interrogation" under *Miranda*, a point which the Government appears to have conceded by only addressing the issue of whether Defendant was in custody.  (Dkt. No. 43 at 10-11.)

subsequent statements, and therefore his subsequent statements should also be suppressed.  (Dkt.

No. 43 at 12-17.)  In support of this argument, Defendant argues that the FBI agents engaged in a

deliberate two-step interrogation strategy, bringing his case within the principles outlined by

*Missouri v. Seibert*, 542 U.S. 600 (2004).  (*Id*. at 13.)  More specifically, Defendant argues that

the FBI engaged in "calculated deception" to avoid complying with *Miranda*.  (*Id*. at 14.)

Defendant argues that this occurred for the following reasons: (1) the presence of fourteen agents

shows that the officers had every intention of taking Defendant into custody in order to question;

(2) a polygraph examiner was waiting at the police substation to conduct a polygraph

examination immediately following Defendant's unwarned statements; and (3) Defendant was

asked to sign a consent-to-polygraph form and an advice-of-rights form immediately following

the first round of questioning.  (*Id*. at 14-15.)  Therefore, under the factors outlined by *Seibert*,

Defendant argues that the statements he made subsequent to the initial round of questioning

should also be suppressed.  (Dkt. No. 43 at 15-16.)

### 4.     Defendant's (Post-Hearing) Supplemental Memorandum of Law

Generally, in his (post-hearing) supplemental memorandum of law, Defendant asserts

three arguments: (1) Defendant's statements made during the first interrogation must be

suppressed as having been illegally obtained in violation of *Miranda*, because (a) the objective

circumstances of Defendant's interview clearly support a finding that a reasonable person would

have believed he was in custody, and (b) once he was in custody, Defendant was subjected to the

first interrogation without being read his *Miranda* rights (rendering all statements made prior to

the waiver of his *Miranda* rights inadmissible); (2) Defendant did not make a knowing,

intelligent or voluntary waiver of his *Miranda* rights before the second interrogation (during the

polygraph examination), because, *inter alia*, by discussing Defendant's recent admissions of guilt before advising him of his *Miranda* rights, the agents downplayed and trivialized the invocation of his Miranda rights; and (3) the first illegal interrogation of Defendant impermissibly tainted the subsequent statements by Defendant, rendering all subsequent statements made by him inadmissible.  (Dkt. No. 56.)[16]

### 5.   Government's (Post-Hearing) Supplemental Memorandum of Law

Generally, in its (post-hearing) supplemental memorandum of law, the Government asserts seven arguments: (1) based on the evidence adduced at the hearing, it is clear that a reasonable person in Defendant's situation would have understood that his freedom of action was not curtailed to a degree associated with a formal arrest; (2) based on the evidence adduced at the hearing, it is clear that the agents did not Mirandize Defendant until they had acquired sufficient evidence to arrest him and he was in their custody; (3) based on the evidence adduced at the hearing, it is clear that the FBI polygrapher Mirandized Defendant as a matter of procedure, and not as part of a deliberate strategy to elicit a Mirandized confession; (4) to the extent there is any conflict between Defendant's affidavit and the hearing testimony of the Government's witnesses, Defendant's affidavit should not be credited against the hearing testimony of the Government's witnesses, because Defendant was not subject to cross-examination; (5) the objective circumstances of the agents' first interview of Defendant do not support a finding that Defendant was in "custody," because (a) a police station interview of an

---

[16]      While Defendant argues that at the end of the hearing the Court asked for, or granted Defendant's request for leave to submit, "proposed findings of fact indexed to the transcripts and conclusions of law," the Court never did so.  (*Compare* Dkt. No. 56 at 2 [Def.'s Suppl. Memo. of Law] *with* Dkt. No. 55 at 170 [Hrg. Tr.].)

individual suspected of committing a crime is not inherently "custodial," (b) frisking or patting down a suspect does not render a subsequent interview "custodial," and (c) recent Second Circuit decisions evaluating the totality of circumstances where suspects were interviewed during the execution of search warrants (i.e., its decisions in *United States v. Schaffer*, 851 F.3d 166 [2d Cir. 2017), and *United States v. Faux*, 828 F.3d 130 [2d Cir. 2016]) suggest that suppression is not warranted in this case); (6) Defendant's confession to the polygrapher was not the product of a deliberate two-step strategy to deprive Defendant of his Fifth Amendment rights; and (7) in any event, Defendant's admissions were voluntary.  (Dkt. No. 57.)

### E.   Briefing on Defendant's Motion to Suppress Evidence

#### 1.   Defendant's Memorandum of Law

Generally, in his motion to suppress evidence, Defendant argues that all of the evidence seized by the FBI from his computer pursuant to the NIT warrant should be suppressed for five reasons.  (Dkt. No. 27-1.)

First, Defendant argues that the warrant approving the NIT search of his computer was not supported by probable cause.  (Dkt. No. 27-1 at 11-21.)  More specifically, Defendant argues that the warrant application contained several problems with the description of the website's homepage, and that these descriptions did not make it clear that the website's illegal purpose or content was readily apparent.  (*Id*. at 11-15.)  Further, Defendant argues that the NIT warrant did nothing to distinguish between "accidental browsers" and individuals who were intending to view child pornography, noting that the NIT code would access a person's computer as soon as they logged into the website in general, not when the person specifically accessed child pornography.  (*Id*. at 17-19.)  These deficiencies, Defendant argues, prevent a finding that the warrant was supported by probable cause.  (*Id*. at 11-21.)

Second, Defendant argues that the FBI intentionally or recklessly misled the U.S. magistrate judge who issued the warrant about the nature of the website "Playpen," and therefore requests that this Court hold a *Franks* hearing.  (Dkt. No. 27-1 at 21-26.)[17]  In support of this argument, Defendant argues that the FBI falsely described the "Playpen" homepage in order to establish probable cause that those who visited the website did so with the purpose of accessing child pornography.  (*Id*. at 21-23.)  Additionally, Defendant argues that the affiant was either uninformed, or recklessly misled, about how websites are found on the "Tor Network."  (*Id*. at 23.)  Defendant argues the affiant's claim (that anyone who "found" Playpen online did so with the purpose of seeking out child pornography) is simply not true because the "Tor Network" offers similar search functions as Google or Bing, which could have allowed individuals to find Playpen for other, non-criminal purposes.  (*Id*. at 23-24.)  Furthermore, Defendant argues that the affiant's description of Playpen's uploading and sharing features was misleading.  (Dkt. No. 27-1 at 24-25.)  Therefore, Defendant argues these false or misleading statements must be removed from the affidavit, and a *Franks* hearing should be held on this issue.  (*Id*. at 26.)

Third, Defendant argues that the NIT warrant was unconstitutionally overbroad because the warrant provided the FBI with sweeping search and seizure power, circumventing the particularity prong of the warrant requirement.  (Dkt. No. 27-1 at 26-29.)  More specifically, Defendant notes that the warrant authorized NIT searches anytime an individual logged onto the website, regardless of whether he actually accessed illegal material.  (*Id*. at 27.)  What is more, Defendant argues that even the FBI acknowledged it could have limited the searches to only

---

[17]     Because this Decision and Order is intended primarily for review by the parties, familiarity with the standards of *Franks v. Delaware*, 438 U.S. 154 (1978), are assumed.

those visitors who viewed or downloaded child pornography.  (*Id.*)  In further support of his position, Defendant argues that computer files are entitled to higher protection under the Fourth Amendment because of the scope and quantity of private information they may contain.  (*Id.* at 28-29.)  Accordingly, Defendant argues that any evidence obtained from this overbroad warrant, which authorized searches of any private computer that accessed Playpen, should be suppress. (*Id.* at 29.)

Fourth, Defendant argues that the NIT warrant was an anticipatory warrant with a premature "triggering event" that authorized a search before probable cause was established. (Dkt. No. 27-1 at 29-31.)  Defendant argues that the "triggering event" for the search occurred when an individual logged onto the website.  (*Id.* at 30.)  Defendant argues that at the time an individual logged into Playpen, there was not yet probable cause to believe the individual accessed the site for the purpose of seeking child pornography because the homepage did not reveal that the website was "unabashedly" dedicated to child pornography.  (*Id.*)  Therefore, Defendant argues that searching the computers at the time of log in was premature–occurring before probable cause existed.  (*Id.*)  Additionally, Defendant argues that the actual content of Playpen is irrelevant to this issue because the search occurred before a user could even access that content.  (Dkt. No. 27-1 at 30.)  Accordingly, Defendant argues that, because these searches occurred before probable cause existed, they exceeded the authorization of the warrant and the evidence found in those searches must be suppressed.  (*Id.* at 31.)

Finally, Defendant argues that the search of his computer in New York exceeded the jurisdictional authorizations of the warrant.  (Dkt. No. 27-1 at 31-45.)  Defendant argues that, by its terms, the NIT warrant authorized searches of property "located in the Eastern District of

Virginia," which means the search of his computer in New York violated the warrant.  (*Id*. at 31-33.)  In further support, Defendant argues that the NIT warrant violated the jurisdictional requirements of  Fed. R. Crim. P. 41 and 28 U.S.C. § 636(a).  (*Id*. at 33-45.)  More specifically, Defendant argues as follows: (1) none of the subsections of Fed. R. Crim. P. 41 provide a basis for concluding that his computers were within the Eastern District of Virginia; (2) the U.S. magistrate judge was without authority to issue a warrant beyond the Eastern District of Virginia; (3) the violations of Fed. R. Crim. P. 41 and § 636(a) were of constitutional magnitude; and (4) he was prejudiced as a result of this warrant.  (*Id*.)  As a final point on this issue, Defendant argues that other district courts involved with cases concerning Operation Pacifier have found that the NIT warrant has violated Fed. R. Crim. P. 41(b), and that this Court should also find that Fed. R. Crim. P. 41 was violated.  (Dkt. No. 27-1 at 43-45.)

### 2. Government's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, the Government argues that Defendant's motion to suppress evidence should be denied for seven reasons.  (Dkt. No. 34.)

First, the Government notes that twenty-eight other district courts have already issued decisions on suppression motions involving Operation Pacifier, and that twenty-four of those cases have denied the suppression motion.  (Dkt. No. 34 at 12.)  The Government argues that these courts have reached different conclusions concerning whether Fed. R. Crim. P. 41(b) was violated, but that all twenty-four decisions have held that the evidence was admissible pursuant to the good-faith exception to the exclusionary rule, and that this Court should do the same.  (*Id*.)

Second, the Government argues that the NIT warrant was proper because the affidavit provides sufficient information to support the U.S. magistrate judge's finding that probable cause existed.  (*Id*. at 14-22.)  More specifically, the Government highlights the following points

supporting the affiant's detailed assessment that those who accessed Playpen did so fully aware of its purpose and content: (1) the website required users to download software and know a precise algorithm-generated URL in order to access the website; (2) the website was listed on a "hidden service" page associated with pedophilia and child pornography; (3) the website's homepage included "two images depicting partially clothed prepubescent females with their legs spread apart," as well as instructions detailing the file sharing capability of the site; (4) the terms and conditions for registration warned prospective users about the risks of being identified; and (5) the vast majority of the content was dedicated to child pornography.  (Dkt. No. 34 at 14-17.)  The Government also argues that case law has established that membership in a child pornography website provides sufficient probable cause for a search warrant.  (*Id*. at 17-18.)  What is more, the Government argues that no other court considering the NIT warrant has concluded that the warrant was not supported by probable cause.  (*Id*. at 19.)  Finally, the Government argues that Defendant's counter-arguments are without merit, reiterating the affiant's expertise to support his judgment that Playpen was forum for sharing child pornography, as well as the sophisticated nature of the website that makes an "unwitting" discovery of the website "extremely unlikely."  (*Id*. at 20-22.)

Third, the Government argues that the Defendant has not made a showing to justify a *Franks* hearing.  (*Id*. at 22-27.)  The Government argues that the affiant reviewed Playpen on February 18, 2015, and found it as described in his affidavit.  (Dkt. No. 34 at 23.)  The Government argues that the homepage logo change occurred on February 19, 2015, sometime before FBI agents executed a search of the Playpen administrator's home, apprehended him, and seized control of the website.  (*Id*.)  Because the NIT warrant was sworn to and authorized on

February 20, 2015, the day after the logo change, the Government argues that the affiant's failure to explain the warrant change was an unintentional oversight or a good-faith mistake, which does not meet the requisite standard for a *Franks* hearing.  (*Id*. at 25.)  Additionally, the Government argues that, even if the omission could be considered intentional, it was immaterial to the probable cause analysis and therefore a hearing is not required.  (*Id*.)  With regard to Defendant's other arguments, the Government argues that Defendant's contentions are merely disagreements with the affiant's conclusions about the ability of an internet browser to locate Playpen online and the functionality of the chat services, and as a result, do not entitle Defendant to a *Franks* hearing.  (*Id*. at 15-27.)

Fourth, the Government argues that the NIT warrant satisfied the particularity requirements of the Fourth Amendment.  (Dkt. No. 34 at 27-33.)  More specifically, the Government argues the warrant sufficiently described the places to be searched as the computers of users or administrators that logged onto the Playpen website, as well as the things to be seized, which were seven specific identifying items from the computers that accessed Playpen. (*Id*. at 27-30.)  More importantly, the Government argues that these particularized locations and things to be seized were supported by probable cause, and therefore the fact that numerous locations were authorized to be searched, or that narrower means could have been used, is meaningless under the Fourth Amendment's requirements.  (*Id*. at 29-30.)  Additionally, the Government points to case law, which recognizes that a defendant does not have a reasonable expectation of privacy in an IP address, even if he is using the Tor internet service.  (*Id*. at 30-33.)

Fifth, the Government argues that Defendant's argument, namely that the "triggering event" for the NIT warrant never occurred, is without merit.  (Dkt. No. 34 at 33-34.)  The Government argues that, for an anticipatory warrant, there must be probable cause that the "triggering event" will occur, as well as probable cause that, if the "triggering event" does occur, contraband or evidence of a crime will be found in a particular place.  (*Id*. at 33.)  As explained above, the Government argues there was ample probable cause for both determinations: specifically, that there was probable cause for the "triggering event" (namely, that individuals logged into Playpen for the purpose of seeking child pornography), and that there was probable cause that contraband or evidence of a crime would be found after the "triggering event," given that the majority of Playpen's content was dedicated to child pornography.  (*Id*. at 33-34.)

Sixth, the Government argues that the NIT warrant was authorized by Fed. R. Crim. P. 41.  (*Id*. at 34-53.)  Concerning the jurisdictional requirements, the Government argues that the broad, flexible interpretation of Fed. R. Crim. P. 41 and its amendments supports the conclusion that the NIT code functions in a similar manner as a "tracking device."  (Dkt. No. 34 at 34-39.)  The Government argues that this code was deployed on the server located in the Eastern District of Virginia, installed only on computers that accessed that server, and that this process was reviewed by a magistrate just from that district, thereby satisfying the requirements of Fed. R. Crim. P. 41.  (*Id*. at 39-42.)

Alternatively, even if Fed. R. Crim. P. 41 was violated, the Government argues that there are two reasons that nevertheless justify the search: (1) the violation only amounts to a technical

error, and therefore suppression is not required nor available as a remedy;[18] and (2) the search

was justified by the exigency exception.  (*Id*. at 42-53.)

Finally, the Government argues that notwithstanding a jurisdictional flaw, the good-faith

exception to the Fourth Amendment's exclusionary rule bars suppression.  (*Id*. at 53-60.)  More

specifically, the Government argues any jurisdictional flaw was the product of the FBI's good-

faith effort to identify the appropriate venue to apply for a warrant, and suppressing the evidence

in this case would not serve any deterrent purposes of the exclusionary rule.  (Dkt. No. 43 at 53-

56.)  Furthermore, the Government argues that the four courts involved with Operation Pacifier

that ruled to suppress evidence are incorrect, and that this Court should instead follow the

decision of numerous other courts that have concluded the good-faith exception does apply to the

NIT warrant involved here.  (*Id*. at 59.)  Lastly, the Government argues that the FBI agents in

Syracuse who executed the Residential Warrant on Defendant's home did so in good-faith

reliance on the NIT warrant, the information sent to them by the FBI concerning Defendant's use

of Playpen, and the approval of the Northern District of New York's magistrate judge who

reviewed and signed the Residential Warrant.  (*Id*. at 59-60.)  Thus, even if the good-faith

exception does not apply to the NIT warrant, the Government argues that the good-faith

exception would preclude exclusion of evidence recovered pursuant to the Residential Warrant.

(*Id*.)

_____

[18]     More specifically, the Government argues that any jurisdictional violation was
not deliberate, in that the FBI worked reasonably to comply with the Fourth Amendment's
warrant requirement, and that, in any event, Defendant was not prejudiced by the warrant, in that
prejudice requires a greater showing that merely, but for the warrant, the search would not have
occurred.  (Dkt. No. 34 at 45-51.)

### 3.      Defendant's Reply Memorandum of Law

Generally, in his reply memorandum of law, Defendants makes five arguments.  (Dkt. No. 42.)

First, Defendant argues again that the NIT warrant was not supported by probable cause. (*Id*. at 2-7.)  Defendant reiterates that the change to Playpen's homepage rendered the affidavit insufficient to establish probable cause because the change no longer made Playpen's purpose or content readily apparent.  (*Id*.)  Defendant argues that the Government's reliance on the actual content of the website is irrelevant because the Second Circuit test requires that the site's illegal purpose must be apparent from the homepage.  (*Id*. at 5-7.)  As a result, Defendant argues that the NIT warrant lacked probable cause.  (*Id*.)

Second, Defendant argues that a *Franks* hearing is necessary, and that he has made the requisite showing.  (Dkt. No. 42 at 7-8.)  Defendant again stresses the recklessness of the FBI's failure to inform the magistrate of the change to Playpen's homepage, which Defendant argues is critical to the probable cause determination.  (*Id*.)

Third, Defendant repeats his argument from his original motion to suppress, arguing that the NIT warrant violated Fed. R. Crim. P. 41 and 28 U.S.C. § 636.  (*Id*. at 9-15.)  Defendant argues that of the thirty Operation Pacifier cases that have faced a motion to suppress evidence, twenty-six have found that Fed. R. Crim. P. 41 was violated.  (*Id.* at 13-14.)  Additionally, Defendant argues that the violation in this case was more than a technical violation, as the Government claims, but rather was a substantial violation of Fed. R. Crim. P. 41 warranting suppression.  (Dkt. No. 42 at 15-20.)  More specifically, Defendant claims the "jurisdictional flaw" violates the substantive components of Fed. R. Crim. P. 41 and 28 U.S.C. § 636, as the

rule and statute specifically outline the territorial limitations of a warrant and a U.S. magistrate judge's authority.  (*Id*. at 15-17.)  Further, Defendant argues that he was prejudiced by the resulting violation, and therefore suppression is required.  (*Id*. at 20-21.)

Fourth, Defendant argues that the search was not justified by any exception to the warrant requirement.  (*Id*. at 21-28.)  Defendant supports this argument by arguing that he had a reasonable expectation of privacy in the contents of his computer.  (Dkt. No. 42 at 21-26.)  More specifically, Defendant argues that the inherently private nature of the Tor network negates the claim that Defendant shared his IP with a third-party.  (*Id*.)[19]  In further support of his argument, Defendant argues that exigent circumstances do not justify the NIT warrant.  (*Id*. at 26-27.)  Defendant maintains that the exigency exception allows police officers to conduct a search without a warrant because the delay in time to obtain a warrant might interfere with the police's ability to obtain evidence, such as when a delay might result in evidence being destroyed.  (Dkt. No. 42 at 26-27.)  Therefore, Defendant argues that the fact that a warrant already existed in this case negates any claim that the FBI needed to act in exigency.  (*Id*. at 26-27.)  The lack of exigency is further highlighted, Defendant argues, by the fact the FBI continued to operate Playpen for a period of two-weeks.  (*Id*. at 27.)

Finally, Defendant argues that the good-faith exception to the exclusionary rule does not apply.  (*Id*. at 28-34.)  More specifically, Defendant argues that the FBI cannot rely on the good-faith exception because (1) the magistrate was knowingly misled, (2) the magistrate abandoned her judicial role by issuing warrants outside of her district in violation of Fed. R. Crim. P. 41 and

---

[19]     Defendant also analogizes the physical, trespassory nature of the NIT search here to that prohibited in *United States v. Jones*, 132 S. Ct. 945, 950 (2012).  (Dkt. No. 42 at 22-23.)

28 U.S.C. § 636, and (3) the warrant application was lacking in probable cause. (*Id*. at 29.) In further support of this position, Defendant urges this Court to be persuaded by the rationale of the four other Operation Pacifier courts that concluded the good-faith exception did not apply because the NIT warrant was void *ab initio*, with emphasis on the decision in *United States v. Levin*, 186 F. Supp.3d 26 (D. Mass. 2016). (*Id*. at 31-34.)

## III.   GOVERNING LEGAL STANDARDS

### A.   Standard Governing Motion to Dismiss an Indictment for "Extreme and Outrageous" Government Conduct

"In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991); *accord Hampton v. United States*, 425 U.S. 484, 489-90 (1976); *see also United States v. Russell*, 411 U.S. 423, 431-32 (1973) (opining "[the Court] may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction").

Indeed, to obtain a dismissal of an indictment based on a claim of outrageous conduct, a defendant must prove that the government engaged in such outrageous behavior in connection with the alleged criminal events that due process considerations bar the government from prosecuting him. *Cuervelo*, 949 F.2d at 565. The outrageous conduct of the government must be viewed standing alone, and a due process violation will be found only where the government conduct is so offensive that it "shocks the conscience." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991); *cf. Rochin v. California*, 342 U.S. 165, 172 (1952) (requiring a doctor to pump petitioner's stomach against his will to induce vomiting so that officers could recover drug

capsules he had ingested "is conduct that shocks the conscience"); *see also United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (stating that, "[g]enerally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person").  Because of the courts' "well-established deference to the Government's choice of investigatory methods," proving the government engaged in outrageous conduct is a "very heavy" burden.  *Al Kassar*, 660 F.3d at 121 (quoting *United States v. Rahman*, 189 F.3d 88, 131 [2d Cir. 1999]).

In *United States v. Chin*, the Second Circuit suggested that the government's conduct can also be "outrageous" if it violates the rights of third parties, such as the victims of the crime the government is investigating.  *Chin*, 934 F.2d at 399-400.  In *Chin*, an undercover United States Postal Inspector encouraged the defendant to travel abroad to purchase child pornography.  *Id*. at 395-96.  The court rejected the defendant's claim that the encouragement by the undercover agent amounted to "outrageous government conduct," but, in doing so, expressed concern about the defendant's due process claim from the perspective of third-party victims of his crime.  *Id*. at 398-99.  Specifically, the court noted as follows:

> One factor distinguishes this case from the usual undercover operation and . . . raises very serious concerns with respect to the rights of third parties – namely, the rights of children Congress sought to protect in enacting the prohibitions on child pornography . . . . [T]he government agent in this case encouraged Chin to go out and commit a *real* crime, with *real* victims, just so Chin could later be arrested and prosecuted.

*Id*. at 399.  The court explained that "[a] necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is proof that the government action actually caused the defendant to commit a crime that would otherwise not have been committed," and concluded that Chin could not make this showing.  *Id*. at 400.

**B.     Standard Governing Motion for a Bill of Particulars**

Rule 7(f) of the Federal Rules of Criminal Procedure allows a defendant to request a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling him to prepare for trial and to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). "The decision to grant or deny a defendant's request for a bill of particulars rests in the sound discretion of the trial court." *United States v. Guerrero*, 09-CR-0339, 2009 WL 3762117, at *7 (S.D.N.Y. Nov. 10, 2009) (citing *United States v. Walsh*, 194 F.3d 37, 47 [2d Cir. 1999]) (other citations omitted).

"To obtain a bill of particulars, the defendant must show that the charges of the indictment are so general that they do not advise him of the specific acts of which he is accused." *Guerrero*, 2009 WL 3762117, at *7 (citing *Torres*, 901 F.2d at 234). "The standard applied to the information sought is not whether it is helpful to the defense but whether it is necessary to apprise the defendant of the charges against him." *Id*.

"An order directing the filing of a bill of particulars will not be issued simply to force the Government to particularize all of its evidence." *Id*. "Nor will a defendant be permitted to use a request for a bill of particulars to compel the government to disclose the manner in which it will prove the charges or preview the government's evidence or legal theory." *Id*. "Simply put, a defendant may not employ a bill of particulars as a general investigative tool." *Id*. Moreover, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Trippe*, 171 F. Supp.2d 230, 240 (S.D.N.Y. 2001) (collecting cases).

### C.     Standard Governing Motion to Compel Discovery

Because the parties have (in their motions papers) indicated an adequate understanding of the legal standard governing Defendant's motion to compel discovery, the Court will not summarize that legal standard in this Decision and Order, which is intended primarily for the review of the parties.

### D.     Standard Governing Motion to Suppress Statements

#### 1.     Standard Governing Whether a Suspect Is in Custody

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any case to be a witness against himself."  U.S. Const. amend. V.  In the context of custodial interrogations, the Supreme Court created procedural safeguards to protect the individual's Fifth Amendment right against self-incrimination, commonly known as "*Miranda* rights."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.")  Therefore, "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior [*Miranda*] warning."  *Perkins*, 496 U.S. at 296.

To determine whether an individual is in custody, a court looks at the totality of the circumstances and asks "how a reasonable man in the suspect's position would have understood his situation."  *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 [1984]).  This test is an objective one, and begins with "whether a reasonable person would have thought he was free to leave the police encounter at issue."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004).  If the answer to this question is no,

then the court must ask a second question, "whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672; *see also Faux*, 828 F.3d at 135 (explaining that "the second inquiry is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized . . . [and] [n]ot all seizures amount to custody" [internal quotation omitted]); *accord, California v. Beheler*, 463 U.S. 1121, 1125 (1983). "Only if the answer to this second question is yes was the person in custody for practical purposes and entitled to the full panoply of protections prescribed by *Miranda*." *Newton*, 369 F.3d at 672 (quoting *Berkemer*, 468 U.S. at 440) (internal citations omitted);

An individual's subjective belief does not bear on the custody analysis, nor do the subjective views of the interrogating officers. *Stansbury v. California*, 511 U.S. 318, 323 (1994); *accord Faux*, 828 F.3d at 135. Instead, a court considers various factors to determine whether the individual was in custody, including the following: (1) "the interrogations's duration; (2) its location . . . ; (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *Faux*, 828 F.3d at 135 (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 [2d Cir. 2011]) (internal citations omitted). The Second Circuit also considers the language and tone used by the police, as well as whether the suspect is searched, frisked, or patted down. *See*, *e.g.*, *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998).

### 2.    Standard Governing Two-Step Interrogations

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court addressed whether the initial failure of law enforcement officers to administer *Miranda* warnings during a custodial

interrogation taints a subsequent admission made by a suspect in a second round of custodial interrogation after being fully advised of his *Miranda* rights.  After reviewing the interplay of the Fourth Amendment's exclusionary rule with the Fifth Amendment and *Miranda* warnings, the Court determined that the relevant inquiry is whether the second, *Mirandized* statement was voluntarily made.  *Elstad*, 470 U.S. at 318.  If so, the statement is admissible.  *Id*.

However, in *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion), the Supreme Court addressed a police protocol that developed in the wake of *Elstad*, where police would deliberately withhold *Miranda* warnings during the first custodial interrogation, obtain a confession from a suspect, and then offer *Miranda* warnings and have the suspect repeat his or her confession.  In holding that this deliberate, two-step interrogation renders the subsequent, warned statements inadmissible, the plurality offered a defendant-oriented, five-factor inquiry to determine whether delayed *Miranda* warnings could be considered effective.  *Seibert*, 542 U.S. at 615 (plurality opinion).  Those factors are as follows:

> [1] [T]he completeness and detail of the questions and answers in the first round of interrogation; [2] the overlapping content of the two statements; [3] the timing and setting of the first and the second [interrogation]; [4] the continuity of police personnel; and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615 (plurality opinion).

Justice Kennedy wrote a concurring opinion in *Seibert*, explaining his belief that "the plurality's 'objective inquiry from the perspective of the suspect'–which 'applies in the case of both intentional and unintentional two-stage interrogations'–cut too broadly."  *United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (quoting *Seibert*, 542 U.S. at 621 [Kennedy, J., concurring]).  Justice Kennedy offered a narrower test for the "infrequent case" where a two-step

interrogation technique was designed to "undermine the *Miranda* warning" and no curative measures were taken. *Williams*, 681 F.3d at 40. "In the absence of a finding of deliberateness, Justice Kennedy believed, the admissibility of any subsequent statement should continue to be governed by the principles of *Oregon v. Elstad*, [] which looks solely to whether the statements were knowingly and voluntarily made." *Id.* at 41.

The Second Circuit has adopted Justice Kennedy's concurring opinion as controlling, explaining as follows:

> In *United States v. Carter*, 489 F.3d 528 (2d Cir. 2007), we joined our sister circuits in regarding Justice Kennedy's concurrence in *Seibert* as controlling. We concluded that *Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession. [*Carter*, 489 F.3d at 546]. In [*United States v. Capers*, 627 F.3d 470 (2d Cir. 2010)], we further joined our sister circuits in concluding that a court should review "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." 627 F.3d at 479. Finally, we held that the Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy. *Id.* at 480.

*Williams*, 681 F.3d 35, 41 (2d Cir. 2012).

In this light, the Second Circuit has articulated a straightforward analysis. *See, e.g.*, *United States v. Moore*, 670 F.3d 222, 229-30 (2d Cir. 2012). A court must first ask if "the initial statement, though voluntary, [was] obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further." *Moore*, 670 F.3d at 229. "If the initial statement *was* obtained in violation of the defendant's *Miranda* rights," the court must then ask a second question, "has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-

step process calculated to undermine the defendant's *Miranda* rights?"  *Id*. at 229-30.  "If so, the defendant's post-warning statement is admissible so long as it, too, was voluntary."  *Id*. at 230. "If not, the post-warning statement must be suppressed unless curative measures . . . were taken before the defendant's post-warning statement."  *Id*.

With respect to objective factors, courts are to be guided by, but not limited to, the five factors outlined by the *Seibert* plurality to determine if the government deliberately intended to undermine the defendant's *Miranda* rights.  *Williams*, 681 F.3d at 41.  As to subjective evidence of intent, a court considers the officer's rationale for failing to give *Miranda* warnings, as well as the credibility of that testimony.  *Moore*, 670 F.3d at 229.  Courts should conduct a "somewhat closer scrutiny of an [officer's] testimony of subjective intent when the proffered rationale is not a legitimate reason to delay or where it inherently lacks credibility in view of the totality of the circumstances."  *Id*. at 229 (internal citations omitted).  However, "[s]uch scrutiny is not ordinarily required when the reason for delay is legitimate, such as officer or community safety or when delay is a product of a rookie mistake, miscommunication, or a momentary lapse in judgment."  *Id*.  "Moreover, if it is found, after weighing the [officer's] credibility, that the [officer's] intent was not calculated . . . to undermine *Miranda*, delay will not require exclusion of the later, warned statement *even if the court finds that the delay was for an illegitimate reason and even in the absence of curative measures*."  *Id*. (emphasis added); *accord*, *Williams*, 681 F.3d at 43.[20]

_____

[20]      Indeed, "[s]ubjective evidence of the [officer's] intent, if credible, will of course be persuasive, and often decisive."  *Moore*, 670 F.3d at 230 n.3.

### E.   Standard Governing Motion to Suppress Evidence

Because the parties have (in their motion papers) indicated an adequate understanding of the legal standards governing all of the issues involved in Defendant's motion to suppress evidence, the Court will not summarize those legal standards in this Decision and Order, which is intended primarily for the review of the parties.

## IV.   ANALYSIS

### A.   Defendant's Motion to Dismiss the Indictment

After carefully considering this matter, the Court denies Defendant's motion to dismiss the Indictment for the reasons stated in the Government's opposition memorandum of law.  *See, supra,* Part II.A.2. of this Decision and Order.  To those reasons, the Court adds only that it finds a recent decision by the U.S. District Court for the Eastern District of New York to be persuasive.  *See United States v. Kim*, 16-CR-0191, 2017 WL 394498, at *3-9 (E.D.N.Y. Jan. 17, 2017) (denying the defendant's motion to dismiss the indictment based on outrageous government conduct, involving this same FBI investigation into "Playpen").

### B.   Defendant's Motion for a Bill of Particulars

After carefully considering this matter, the Court denies Defendant's motion for a bill of particulars for the reasons stated in the Government's opposition memorandum of law.  *See, supra,* Part II.B.2. of this Decision and Order.  To those reasons, the Court adds only that the *Davidoff* and *Bortnovsky* decisions cited by Defendant on page 6 of his memorandum of law (in support of the argument that it is not sufficient that the defense may be given an opportunity to review the information requested) are inapposite because (1) they involved a turnover of material more copious than that in question in this case, and (2) in any event, they are not child pornography cases and thus do not implicate the protections of 18 U.S.C. § 3509(m).

### C.      Defendant's Motion to Compel Discovery

After carefully considering this matter, the Court denies Defendant's motion to compel

discovery for the reasons stated in the Government's opposition memorandum of law.  *See,*

*supra,* Part II.C.2. of this Decision and Order.

### D.      Defendant's Motion to Suppress Statements

After carefully considering this matter, the Court denies Defendant's motion to suppress

statements.  The Court will address each of the issues concerning the suppression of statements

in turn.

### 1.      Whether Defendant Was in Custody for Purposes of *Miranda*

The Court begins its analysis by emphasizing that, under Second Circuit precedent, the

custody inquiry begins with whether a reasonable person would have felt "free to leave."

*Newton*, 369 F.3d at 672.  If a reasonable person would not have felt "free to leave," then the

court considers a second question: "whether a reasonable person would have understood his

freedom of action to have been curtailed to a degree associated with formal arrest."  *Newton*, 369

F.3d at 672; *see also Faux*, 828 F.3d at 135 (explaining that "the second inquiry is the ultimate

inquiry because a free-to-leave inquiry only reveals whether the person questioned was seized . .

. [and] [n]ot all seizures amount to custody") [internal quotation omitted].  The Court finds that

this question is where Defendant's motion fails.  In rendering this finding, the Court notes the

similarities between Defendant's case and several other cases, and will therefore briefly review

the relevant facts of those cases.

In *United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009), the Southern

District of New York examined a factually similar circumstance involving a child pornography

investigation.  There, multiple FBI agents executed a search warrant early in the morning at the

41

defendant's home. *Groezinger*, 625 F. Supp. 2d at 158.  The agents were armed, but their weapons remained holstered. *Id*.  The FBI agents told the defendant to stay in the living room while they performed a protective sweep of the residence. *Id*.  The defendant was then moved to the kitchen where he was told to sit down at the table (although he was allowed to make coffee). *Id*.  Two FBI agents remained with the defendant, blocking the exit from the kitchen, while the rest of the FBI team executed the search. *Id*.  However, the defendant was not otherwise handcuffed or physically restrained. *Groezinger*, 625 F. Supp. 2d at 158.  The FBI agents informed the defendant that they had a search warrant, and explicitly told the defendant he was not under arrest. *Id*.  Thereafter, the FBI agents questioned the defendant about his computer. *Id*.  The search, during which the defendant was questioned, last approximately and hour and a half. *Id*.  Under the totality of these circumstances, the district court held that, while a reasonable person would not have felt "free to leave" under these circumstances, "a reasonable person in [the defendant's shoes] would not have understood his freedom of action to have been curtailed to a degree associated with formal arrest," and therefore *Miranda* warnings were not required. *Groezinger*, 625 F. Supp. 2d at 158-59.

Another case, *United States v. Faux*, 828 F.3d 130 (2d Cir. 2016), also presents factual similarities: approximately ten to fifteen FBI agents executed a search warrant early in the morning at the defendant's home; all of the agents were armed, but none drew their weapons; two agents informed the defendant they had search warrants and seized her cell phone; the defendant was separated from her family members inside the home; and the defendant was not allowed to move freely in home (although she was allowed to use the bathroom while an agent stood outside the door, and an agent accompanied the defendant to her bedroom when she asked

if she could put on a sweater).  *Faux*, 828 F.3d at 133.  The interview, which took place in the

dining room, lasted approximately two hours.  *Id*. at 133.  The agents never informed the

defendant that her participation was voluntary, did not tell the defendant she could refuse to

answer questions, nor told her that she was free to leave.  *Id*. at 134.  It was not until about

twenty minutes into the interview that the defendant was told she was not under arrest.  *Id*. at

134.  Under the totality of these circumstances, noting that a reasonable person would not have

felt "free to leave," the Second Circuit concluded that the defendant was not in custody for the

purposes of *Miranda* because a reasonable person in the defendant's position would not have

understood her restriction of freedom to be of the degree of a person under formal arrest.  *Faux*,

828 F.3d at 139.

Finally, in a case stemming from this same child pornography investigation, a U.S.

magistrate judge in the Western District of New York concluded that the defendant was not in

custody because a reasonable person would have felt "free to leave," or alternatively, a

reasonable person would not have believed the restraint on his freedom was tantamount to the

kind associated with formal arrest.  *See United States v. Brooks*, 16-CR-6028, 2016 WL

7409852, at *9 (W.D.N.Y. Dec. 22, 2016), report and recommendation adopted, 2017 WL

370810 (W.D.N.Y. Jan. 26, 2017).  There, at least eight law enforcement officers, including

three FBI agents, executed the search warrant; the agents breached the door with a battering ram

and entered the house with weapons drawn in the "low-ready position." *Id*. at *4. One agent

stayed next to the defendant in the living room while the rest of the team performed a security

sweep for approximately ten minutes.  *Id*.  The agents told the defendant they had a search

warrant.  *Id*. Two FBI agents interviewed the defendant in laundry room; defendant sat in the

chair the farthest away from the closed door of the laundry room. *Id.* He was informed he was not under arrest, that he did not need to speak with them, and that he was free to leave at any time. *Id.* The defendant was not handcuffed or restrained; he was generally cooperative and talkative during the interview, which lasted approximately ninety minutes; and he never asked to stop the interview, leave the room, consult with an attorney, use the restroom, or have anything to eat or drink. *Id.*

Generally, just as in Defendant's current case, those cases involved (1) police-dominated atmospheres with multiple law enforcement agents executing a search warrant, (2) restrictions on the respective defendants' movements during the initial searches of their residences, (3) isolation of the defendants to conduct an interview, (4) interviews that lasted at least ninety minutes, and (5) no physical restraints or handcuffs. Furthermore, as in Defendant's case, two of the cases involved explicit warnings that the defendants were not under arrest. *Faux*, 828 F.3d at 134; *Groezinger*, 625 F. Supp. 2d at 158. The notable difference is that, in Defendant's case, his interview occurred at a police substation, rather than in a room at his residence. As a result, the Court will conduct two custody analyses, the first regarding the custody during the execution of the search warrant, and the second regarding the custody during Defendant's interview with Agents Lyons and Lewis at the police station.[21]

---

[21] Because it is undisputed that Defendant was advised of his *Miranda* rights before the second interview with the polygraph examiner, the Court will address that interview under Defendant's second argument, namely, that the two interviews were impermissible under *Missouri v. Seibert* two-step interrogation technique.

### a.      Execution of the Search Warrant

Under the totality of the circumstances during the execution of the search warrant at Defendant's residence, the Court finds that Defendant was not in custody for the purposes of *Miranda* because a reasonable person in Defendant's position "would not have understood his freedom of action to been curtailed to a degree associated with formal arrest."  *See, e.g., Newton*, 369 F.3d at 672.

In this case, Defendant was initially confronted by three FBI agents upstairs at his bedroom, one of whom was Special Agent Fitzgerald.  (Dkt. No. 55 at 18.)  Defendant was asked to step outside of his bedroom and to stand next to a railing.  (Dkt. No. 55 at 18.)[22]  Agent Fitzgerald testified that Defendant stood next to the railing for "no more than a minute, probably less," explaining that he asked to Defendant to move by the railing because there were a lot of agents moving about the house to make sure it was secure before they began their initial search. (Dkt. No. 55 at 19-20.)  Agent Fitzgerald further testified that he then asked Defendant to sit in a chair by a small table on the other side of the railing until the case agents could come and speak with him.  (Dkt. No. 55 at 20.)  Agent Fitzgerald stood next to Defendant while he was sitting at the table, testifying that he wanted the two of them "to avoid . . . being in the way of other members of the search team that were clearing the house."  (Dkt. No. 55 at 20.)  Special Agent

---

[22]       Special Agents Fitzgerald and Lyons testified that, although they were armed, their weapons remained holstered during the duration of the search.  (Dkt. No. 55 at 22, 50-51.) Defendant's father, Eric Caraher, offered conflicting testimony, stating that the FBI agents had their guns "out" and that they "kept waiving the guns back and forth."  (Dkt. No. 55 at 161-64.) However, Eric Caraher testified that he was downstairs during the entire execution of the search, and that he did not see any of the FBI agents' interactions with Defendant.  In any event, based on the demeanors of the witnesses, the Court finds the agents' testimony on this subject to be more credible than that of Eric Caraher.

Fitzgerald testified that none of the agents yelled at Defendant, and Defendant was never patted down or frisked.  (Dkt. No. 55 at 18, 37-38.)

Shortly thereafter, Special Agents Lyons and Lewis arrived upstairs.  (Dkt. No. 55 at 46, 112.)[23]  Special Agent Lyons testified that he introduced himself to Defendant as an FBI agent, and advised Defendant that he was not under arrest, that he had no obligation to speak with the agents or answer any questions, and that he was free to leave.  (Dkt. No. 55 at 47, 61, 85.)

Special Agents Lyons and Lewis both testified that they asked Defendant if he was willing to speak with them.  (Dkt. No. 55 at 47, 85.)  The agents testified that, after agreeing to speak with them, Defendant was asked by Agent Lewis if he would like to speak to them at the local police station.  (Dkt. No. 55 at 85.)  Specifically, Agent Lewis testified that she offered the police station to Defendant because it was a private location where they could speak, due to the subject matter of child pornography, as well as for convenience, in order to avoid being interrupted by the ongoing search at the residence.  (Dkt. No. 55 at 85-86.)[24]  The agents stated that Defendant agreed to go to the police station, testifying that "he was calm," and that "he was open to [going to the police station], [that he] seemed eager to go."  (Dkt. No. 55 at 48, 86.)

_____

[23]        In his proposed findings of fact, Defendant notes what he characterizes as "conflicting testimony" or "extremely contradictory testimony" by the Government's hearing witnesses.  (*See, e.g.,* Dkt. No. 56, at nn. 4, 5, 7, 8, 9, 10.)  After closely examining the hearing testimony of the Government's witnesses, the Court does not find that it was either "conflicting" or "extremely contradictory"–at least in any material regard.  In any event, based on the substance of the hearing testimony, the Court finds the facts recited in this Decision and Order to have been established by a preponderance of the evidence.

[24]        On cross-examination, Agent Lewis testified that she had not specifically offered Defendant the option to be interviewed at his residence.  (Dkt. No. 55 at 111.)  On re-direct examination, Agent Lewis further testified that, if Defendant had indicated that he wished to be interviewed at his residence, she would have found an appropriate place in the residence to speak with him.  (Dkt. No. 55 at 128-129.)  Agent Lewis testified that Defendant never expressed a preference to remain at home.  (*Id.*)

Agent Lyons testified that Defendant asked to get dressed, and that Defendant agreed to let Agent Lyons escort him to his room.  (Dkt. No. 55 at 48.)  After getting dressed, Defendant was led to Agent Lewis' vehicle by Agents Lyons and Lewis.  (Dkt. No. 55 at 49.)  Before entering the vehicle, Agent Lyons performed a pat-down search of Defendant over his clothing.  (Dkt. No. 55 at 50.)  Agent Lyons rode in the back seat with Defendant. (Dkt. No. 55 at 66-67.)  Defendant was not handcuffed at any point in time.  (Dkt. No. 55 at 50, 87.)

Granted, under these circumstances, there are some facts that would support an argument that a reasonable person in Defendant's position would *not* have felt "free to leave" during the execution of the search at his residence: (1) the number of officers;[25] (2) that he was told to stand next to a railing and to sit at a table;[26] (3) the constant presence of agents by him at all times while he was waiting upstairs, changing in his bedroom, and walking to the Agent Lewis' vehicle; and (4) that he was patted down before entering the vehicle.[27]  However, several facts support the argument that a reasonable person in Defendant's position would have felt "free to leave": (1) that he was expressly told he was free to leave; (2) that he was expressly told that he was not under arrest; (3) that he was expressly told that he did not have to speak with the agents or answer their questions; (4) that he was never yelled at by any agents; (5) that no weapons were ever drawn; (6) that he was never handcuffed; and (7) that he voluntarily agreed to go with Agents Lyons and Lewis to the police station.

---

[25]    The Court notes, however, that "the number of officers is typically not dispositive of custody." *United States v. Schaffer*, 851 F.3d 166, 175 (2d Cir. 2017) (internal citations omitted).

[26]    *Cf. United States v. Schaffer*, 851 F.3d 166, 174 (2d Cir. 2017) (noting that, during the execution of a search warrant, a reasonable person would understand the agent's limited restriction on his freedom of movement as a necessary precaution to protect the integrity of the ongoing search).

[27]    *See, e.g.*, *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998).

Recognizing that the facts of this case presents a close question, the Court will assume for the sake of argument that a reasonable person would not have felt "free to leave" during the execution of the search warrant.  The issue then becomes whether a reasonable person in Defendant's position would not have understood his restraint on freedom of action to be tantamount to that associated with a formal arrest.  *Newton*, 369 F.3d at 672.  After carefully considering the matter, the Court must answer this question in the negative.

As an initial matter, Agent Lyons explicitly informed Defendant that he was not under arrest.  Agent Lyons also informed Defendant that was free to leave and that he did not need to speak with the agents.  Based on these statements, a reasonable person would not have concluded that his movements were restricted to the degree of a person under formal arrest.  In addition, Defendant was never placed in handcuffs or restraints–which often indicate to a reasonable person that he or she is under formal arrest.[28]  In fact, Defendant was permitted to walk freely to his bedroom and change his clothes.[29]  Finally, and significantly, Defendant was provided with the option to go speak at the police station, in part for privacy and convenience (an option which the Court finds that Defendant voluntarily accepted).  A reasonable person, whose liberty had been restrained to a degree associated with formal arrest, would not believe he or she would be given an option to go to the police station.

---

[28]     *See United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (stating that "[h]andcuffs are generally recognized as a hallmark of formal arrest") [citing cases].

[29]     *See United States v. Faux*, 828 F.3d 130, 138 (2d Cir. 2016) ("A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other hallmarks of custody) freedom of action is not being curtailed 'to a degree associated with formal arrest.'") [quoting *Newton*, 369 F.3d at 672]; *accord*, *United States v. Schaffer*, 851 F.3d 166, 175 (2d Cir. 2017).

For all of these reasons, the Court finds that Defendant was not in custody during the execution of the search warrant, and therefore he was not entitled to receive *Miranda* warnings at that time.

### b. Interview by Special Agents Lyons and Lewis

Under the totality of the circumstances, the Court finds that, during Defendant's interview with Special Agents Lyons and Lewis, Defendant was not in custody for the purposes of *Miranda*.

Agent Lyons and Lewis testified that Defendant voluntarily agreed to go to the Morrisville police station after being offered a private place to speak about the child pornography investigation.  (Dkt. No. 55 at 85-86.)  The agents drove with Defendant to the police substation, which was approximately a mile from Defendant's house, or about a three-minute drive.  (Dkt. No. 55 at 51.)  The agents walked with Defendant to a room that was provided by the local police agency.  (Dkt. No. 55 at 51.)  Agents Lyons testified that the room appeared to be an administrative room, with a desk, large computer, and several chairs.  (Dkt. No. 55 at 51.)[30]  The agents testified that there were no bars on the windows, and that there were no handcuffs or chains inside the room for detaining a suspect.  (Dkt. No. 55 at 55, 88.)  The agents testified that the door was closed during the interview.  (Dkt. No. 55 at 68, 120.)  Agent Lewis testified that at this time her weapon, which was holstered, was obscured by her clothing.  (Dkt. No. 55 at 88.)  Agent Lewis testified that Defendant was never handcuffed during the interview.  (Dkt. No. 55 at 98.)[31]

---

[30]    There was conflicting testimony about whether the desk was between the agents and Defendant during the interview, or whether the chairs were arranged in a way that there were no obstacles between the three individuals.  (Dkt. No. 55 at 53, 119.)

[31]    The agents further testified that Defendant was allowed to use the restroom during the interview, which he did twice, and that he was offered food and a bottle of water.  (Dkt. No. 55 at 56, 87-88, 98.)

Agent Lyons testified that, before any questioning began, he once again informed Defendant he was not under arrest, that he was under no obligation to speak with the agents, and that he could stop answering their questions at any time.  (Dkt. No. 55 at 53, 69, 88-89.)  The agents testified that the interview lasted approximately an hour and forty-five minutes, beginning sometime around 7:52 A.M. and ending around 9:28 A.M.  (Dkt. No. 55 at 69-70, 89.)  Agent Lyons testified that they never yelled at or threatened Defendant during the interview, and that Defendant never asked the agents to stop asking questions.  (Dkt. No. 55 at 54, 56.)

Both agents testified that the first half of the interview focused on background information about Defendant, and that they did not ask case-specific questions until about halfway through the interview, close to the one-hour mark.  (Dkt. No. 55 at 71-72, 89-90.)  Specifically, Agent Lewis testified that, after Defendant was asked about the username "Phillip J. Fry," he was then asked questions about who could have accessed the child pornography from the computer.  (Dkt. No. 55 at 90-91.)  Agent Lewis testified that initially Defendant offered that many individuals, such as health care workers and construction workers, could have accessed the internet.  (Dkt. No. 55 at 91.)  However, after Defendant was informed that the website access times did not correspond with the times these individuals were in the home, Agent Lewis asked if Defendant's mother or father could have accessed the computer.  (Dkt. No. 55 at 91.)  Agent Lewis testified that Defendant said it was not his mother, and that he did not want to point the finger at his father.  (Dkt. No. 55 at 91-92.)  Agent Lewis testified that Defendant admitted he did not want to point the finger at his father because Defendant was the one who had accessed the child pornography website.  (Dkt. No. 55 at 91-92.)  Both agents testified that at no point during the interview did they threaten to arrest Defendant's father.  (Dkt. No. 55 at 54, 96.)  The

50

agents testified that Defendant was shown screenshots of the Playpen website, which he initialed

to confirm he had viewed it.  (Dkt. No. 55 at 74, 93-94.)  The initialing occurred at 9:21 A.M.,

and the interview concluded shortly thereafter (i.e., at 9:28 A.M.).  (Dkt. No. 55 at 94.)  Neither

agent took a written statement from Defendant, and the interview was not videotaped or

recorded.  (Dkt. No. 55 at 120, 127.)

  Again, while recognizing that the first question (whether a reasonable person in

Defendant's position would have felt "free to leave") is a close one,[32] the Court nevertheless

finds that Defendant was not in custody based on the second question (whether a reasonable

person in Defendant's position "would not have understood his freedom of action to been

curtailed to a degree associated with formal arrest").  *See, e.g., Newton*, 369 F.3d at 672.  The

Second Circuit, in reviewing Supreme Court case law, has explained as follows:

> In *Oregon v. Mathiason*, 429 U.S. 492 (1977) the Court made clear
> that *Miranda* warnings are not required simply because "the
> questioning took place in a 'coercive environment.'"  *Id* at 495.
> The suspect in *Mathiason* came to a police station voluntarily at
> the request of the police and was questioned in a closed room.
> Although the questioning in *Mathiason* did not occur in a public
> setting, the Court, in ruling *Miranda* warnings unnecessary,
> echoed the statement in *Miranda* that depriving a person of
> "freedom of action" is relevant to triggering *Miranda*. . . . That

---

[32] Indeed, several factors support the argument that a reasonable person would have felt "free to leave" to leave the interview: specifically, that Defendant was expressly told that he was free to leave if he wished to do so; that he was told he was not under arrest and under no obligation to answer questions or speak to the agents; that Defendant voluntarily agreed to speak with them; that Defendant was not restrained or handcuffed in any way during the interview; that the agents did not display, and in fact, obscured their weapons with their clothing; and that the agents did not yell or threaten Defendant during the interview.  However, because this Court has already concluded that a reasonable person would not have felt "free to leave" during the execution of the search warrant (*see, supra,* Part IV.D.1.a. of this Decision and Order), the Court believes that a reasonable person would still believe he or she was not "free to leave" after being transported to the police station.

> thought was repeated in *California v. Beheler*, 463 U.S. 1121
> (1983), another case involving police station questioning: in
> determining "whether a suspect is 'in custody' for purposes of
> receiving *Miranda* protection, the ultimate inquiry is simply
> whether there is a 'formal arrest or restraint on freedom of
> movement' of the degree associated with a formal arrest." *Id*. at
> 1125.

*Cruz v. Miller*, 255 F.3d 77, 81-82 (2d Cir. 2001).

The facts of this case lead to the conclusion that a reasonable person in Defendant's position would not have understood his freedom of action to have been restrained to a degree associated with formal arrest. *See, e.g.*, *Newton*, 369 F.3d at 672. Notably, before the interview began, Defendant was once again advised by Special Agent Lyons that he was not under arrest, that he was free to leave, and that he did not need to answer any questions or speak to the agents. Indeed, Defendant indicated to Special Agent Lyons that he understood, and he was cooperative throughout the interview. In addition, the interview, which lasted slightly under two-hours, was conversational in nature. The agents did not yell at Defendant, make any threats, or engage in hostile questioning. Defendant was not restrained in any way, and he made no indication that he wanted to stop answering questions or leave the interview. Therefore, the Court finds that, while a reasonable person may not have felt "free to leave," under the totality of the circumstances surrounding this interview, a reasonable person would not have believed that his or her restraint of freedom had been curtailed to a degree tantamount with formal arrest.

Defendant argues that, at the point he was confronted with evidence against him during the interview (i.e., when Agents Lyons and Lewis started asking case-specific questions about the Playpen username and showed him screenshots of the website), a reasonable person would have believed he or she was in custody. Relying on *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir.

52

1998), Defendant argues that, at this point in time, he should have been read his *Miranda* rights. The Court rejects this argument for the reasons stated in the Government's opposition memorandum of law.  (Dkt. No. 38 at 10-11.)  To those reasons, the Court adds the following analysis.

The facts surrounding the interview in *Tankleff* are considerably different than those present in this case.  In *Tankleff*, after concluding that the defendant was a suspect in his parents' murders, police asked the defendant to go with them to the police station.  *Tankleff*, 135 F.3d at 240.  The detectives questioned the defendant throughout the forty-minute drive to the police station, and placed him in a ten-foot by ten-foot windowless room.  *Id*.  Once in the room, he was questioned continuously for two hours, and was subjected to increasingly hostile questions.  *Id*. The detectives informed the defendant that they found his story "ridiculous and unbelievably absurd."  *Id*.  One detective faked receiving a phone call, speaking loud enough for the defendant to hear him, stating that the defendant's father had allegedly woken up from a coma, and accused the defendant as his attacker.  *Tankleff*, 135 F.3d at 241.  Notably, the court concluded, based on the totality of the circumstances (the length of time, the hostile questioning, and the ruse involving the false accusation by his father), that a reasonable person would have concluded he or she was in custody during this interview.  *Id*. at 244.

In this case, on the other hand, Defendant was never subjected to hostile questioning. After discussing general background and pedigree information about himself and his family, Defendant was eventually asked case-specific questions about the username "Phillip J. Fry," and about which individuals in the residence had access to the internet.  These questions were not combative or hostile, and Defendant was not told that his answers were "ridiculous" or "absurd."

53

Significantly, unlike in *Tankleff*, Special Agents Lyons and Lewis did not employ a strategic ruse to accuse Defendant of distributing child pornography or engaging in sexual conduct with children.  Instead, Defendant was asked about who had access to the computers, and specifically whether the person accessing the child pornography on the computers could have been his father. Defendant was not threatened that his father would be arrested if he did not make a confession. Furthermore, unlike in *Tankleff*, Defendant was not falsely informed that a family member had accused him of the crime.  Therefore, the Court finds Defendant's analogy to *Tankleff* to be without merit, and concludes that the case-specific questions asked to Defendant to not change the custody inquiry discussed above.

For all of these reasons, the Court finds that, based on the totality of circumstances, Defendant was not in custody during his interview by Special Agents Lyons and Lewis, because a reasonable person in Defendant's position would not have understood his freedom of action to have been restrained to a degree associated with formal arrest.  As a result, Defendant was not entitled to receive *Miranda* warnings, and the statements he made during this interview will not be suppressed.

> **2.** **Whether the Government Engaged in a Deliberate Two-Step Interrogation Technique Which Would Render the Statements Made During the Second Interview Inadmissible**

The Court concludes that, even if the statements made during the first interview were obtained in violation of *Miranda*, the Government did not engage in a deliberate two-step interrogation technique that would render the statements made during the second interview inadmissible.

After the conclusion of the first interview of Defendant, Agents Lyons asked Defendant if he would be willing to take a polygraph examination.  (Dkt. No. 55 at 54-55.)  Generally, the agents testified that the purpose in seeking a polygraph was to determine if Defendant had been involved in any physical, hands-on contact with children.  (Dkt. No. 55 at 55, 96.)  Agents Lyons and Lewis testified that Agent McDonald, the polygrapher examiner, did not listen to or watch their interview of Defendant.  (Dkt. No. 55 at 75, 120.)  Agent McDonald also testified that he was neither present during the interview, nor did he listen to the interview.  (Dkt. No. 55 at 147.)

Generally, Agent McDonald testified about his preparation process for a polygraph examination.  (Dkt. No. 55 at 144-45.)  Agent McDonald testified that he was aware from reviewing the case file that the investigation involved downloading and transmitting child pornography, that there was a username based on a cartoon character, and an IP address linking a website to the residence.  (Dkt. No. 55 at 144-149.)  Agent McDonald testified that he knew multiple adults lived at the residence, but that he was never informed Defendant was the specific suspect.  (Dkt. No. 55 at 145.)  Before meeting with Defendant, Agent McDonald testified that he spoke briefly with Agent Lewis to make sure the questions he prepared were still relevant.  (Dkt. No. 55 at 131-33, 147.)

Agent McDonald testified that he met with Defendant around 9:30 A.M.  (Dkt. No. 55 at 135.)  Agent McDonald testified that Defendant was brought into the room where the polygraph equipment was set up, and that Defendant sat down across the desk from him.  (Dkt. No. 55 at 134.)  Agent McDonald testified that Defendant was not handcuffed or restrained in any way, and that he was not armed during the interview.  (Dkt. No. 55 at 134-135.)  Agent McDonald further testified that, at the time he met with Defendant, he was unaware if Defendant had been

Mirandized, and he was unaware if Defendant had been placed under arrest by Agents Lyons or Lewis.  (Dkt. No. 55 at 134, 149.)

Agent McDonald testified that, before beginning the polygraph examination, he covered Defendant's background information, including his educational history, and explained the examination process.  (Dkt. No. 55 at 150, 154-56.)  Agent McDonald testified that, before administering the examination, Defendant reviewed two different forms on his laptop: an FD-328 consent-to-polygraph form, and an FD-395 advice-of-rights form.  (Dkt. No. 55 at 135-137.)[33]  Agent McDonald testified that Defendant scrolled through the forms with a stylus, and then electronically signed his name on both forms.  (Dkt. No. 55 at 135-137.)  Agent McDonald testified that, after these forms were signed, he administered the polygraph examination.  (Dkt. No. 55 at 138.)  During the course of the examination, Defendant admitted to using the username "Phillip J. Fry" and transmitting child pornography with the KiK messaging application.  (Dkt. No. 55 at 139.)  Agent McDonald testified that Defendant failed the polygraph examination, and subsequently admitted that he had distributed more child pornography than he had stated during the examination.  (Dkt. No. 55 at 139-40.)  Agent McDonald testified that the examination process, including the background information and description of the examination procedure, took approximately forty-fives minutes.  (Dkt. No. 55 at 156.)

After concluding the examination, Agent McDonald testified that he decided to take a written statement from Defendant.  (Dkt. No. 55 at 140.)  Agent McDonald further testified that he was not directed by Agent Lewis to take a statement, and that he was unaware if Defendant

---

[33]    Indeed, it is undisputed that Agent McDonald advised Defendant of his constitutional rights prior to administering the polygraph examination.  Defense counsel did make note that the two waiver forms, the FD-328 consent-to-polygraph form and the FD-395 advice-of-rights form, were both signed at 9:34 A.M.  (Dkt. No. 55 at 150-151.)

had offered any previous written statements.  (Dkt. No. 55 at 157.)  Agent McDonald explained

that he took a statement because "[a written sworn statement from a suspect is] the best evidence

that an examiner can have of, of–in the examinee's own words what happened . . . ."  (Dkt. No.

55 at 157.)  Agent McDonald testified that he typed the statement while he was talking to

Defendant after the examination, and that he allowed Defendant to review the statement and

make any changes before he signed it.  (Dkt. No. 55 at 141-143.)

      As a threshold matter, the Court reiterates its conclusion that Defendant was not in

custody during his first interview with Agents Lyons and Lewis.  *See*, *supra*, Part IV.D.1.b. of

this Decision and Order.  Therefore, the Court can properly admit Defendant's statements from

his second interview with Agent McDonald without reaching the issue of whether the

Government engaged in an impermissible deliberate two-step interrogation.  *See*, *e.g.*, *Moore*,

670 F.3d at 229 (explaining that a court must first ask if "the initial statement, though voluntary,

[was] obtained in violation of the defendant's *Miranda* rights?  If [there was no *Miranda*

violation], there is no need to go further").

      In any event, even if the Court were to assume for the sake of argument that Defendants

statements during the first interview were obtained in violation of Defendant's *Miranda* rights,

the Court finds that the Government has demonstrated by a preponderance of the evidence that it

did not engage in a deliberate two-step interrogation process calculated to undermine

Defendant's *Miranda* rights; and therefore Defendant's statements during his second interview

are admissible because they were made voluntarily.  *Williams*, 681 F.3d at 41; *Moore*, 670 F.3d

at 230.

Beginning with the subjective evidence presented at the hearing, the Court finds that the agents did not act with deliberate intent to undermine *Miranda*.  To the contrary, the agents offered credible, rationale explanations for why Defendant did not receive *Miranda* warnings during his initial interview.  Specifically, Agent Lewis testified that, in cases involving child pornography, even after there has been a confession, there are many other factors that dictate whether a suspect will be arrested–and by extension, whether agents will administer *Miranda* warnings–most notably, physical and forensic evidence.  (Dkt. No. 55 at 97-98, 128.)  Indeed, Agent Lewis testified that she did not learn that forensic evidence implicating Defendant had been discovered until after her interview of Defendant.  (Dkt. No. 55 at 98.)

Further negating any subjective intent to avoid giving Defendant *Miranda* warnings is the proffered reason for asking Defendant if he would take a polygraph examination.  Agent Lyons and Agent Lewis both testified that they asked Defendant to submit to a polygraph examination because of concerns with potential "hands-on offenses" with children.  (Dkt. No. 55 at 78, 96.)  Agent McDonald supplemented this testimony, stating that, in child pornography investigations, a polygraph examiner is often requested to determine if a suspect has physically molested any children.  (Dkt. No. 55 at 130-31.)  This offered rationale for seeking a second interview through a polygraph examination is easily distinguishable from the motivation behind the type of deliberate two-step interrogation that *Seibert* and the Second Circuit's cases are concerned with–planning a second interview merely so that unwarned statements from the first interview may be used as weapons of cross-examination to coerce the suspect into readmitting his initial, unwarned statements following a "midstream *Miranda* warning."

58

Finally, and significantly, Agent McDonald testified that he was unaware if Defendant had been previously advised of his *Miranda* warnings, or if Defendant had been arrested.  Agent McDonald stated that he was following routine procedure when he had Defendant sign a consent-to-polygraph form and an advice-of-rights form before administering a polygraph examination.[34]  Agent McDonald also testified that it is routine procedure for a polygraph examiner to obtain a written statement because that is the best evidence that a polygraph examiner can have from the interview.  Indeed, these facts demonstrate Agent McDonald's subjective intent was to simply comply with procedure, which is drastically different from the subjective intent to produce a confession, quickly warn the suspect of his *Miranda* rights, and then re-obtain that confession.  *Cf. Williams*, 681 F.3d at 45 ("The quintessential two-step technique involves a suspect's 'hearing warnings only in the aftermath of interrogation and just after making a confession,' with the police 'lead[ing] him over the same ground again.'") [quoting *Seibert*, 542 U.S. at 613].

As a result, the Court concludes that the subjective evidence weighs in favor of finding that the Government did not engage in a deliberate, two-step interrogation technique because Agents Lyons and Lewis did not act with calculated intent to undermine *Miranda*.[35]

---

[34]    By all accounts, it appears Agent McDonald would have reviewed these forms even if Defendant had been previously informed of his *Miranda* rights, and even if Agent Lewis had previously arrested Defendant.

[35]    *See Williams*, 681 F.3d at 43 (stating that, "if it is found, after weighing the investigator's credibility, that the investigator's intent was not "calculated . . . to undermine *Miranda*, delay [in administering *Miranda* warnings] will not require the exclusion of the later, warned statement even if the court finds that they delay was not for an illegitimate reason and even in the absence of curative measures); *accord*, *Moore*, 670 F.3d at 229.

Similarly, the Court concludes that the *objective* evidence weighs in favor of finding that the Government did not engage in a deliberate, two-step interrogation technique, based on the totality of the objective factors.[36]  Granted, upon first glance, certain of the objective factors set forth in *Seibert* appear to weigh in favor of Defendant: the apparent completeness and detail of the questions and answers in the first round of interrogation, the apparently overlapping nature of Defendant's statements in the first and second interviews, and the apparently similar timing and setting of the first and second interviews.  However, upon closer examination, some of these factors do not weigh in favor of Defendant, or at least do not weigh strongly in favor of him.[37] Moreover, other factors weight more-strongly against Defendant: the lack of continuity of police personnel in the first and second interviews, and the minimal degree to which the second interrogator's questions treated the second interview as continuous with the first interview.

The Court notes that, despite the fact that the questions during the first interview and those asked during the polygraph examination appear to have been overlapping in nature, the Court finds this overlap was not of the kind that *Seibert* was concerned with–where the unwarned statements are used to cross-examine the second statements.  *See Williams*, 681 F.3d

---

[36]     Courts consider the factors set forth by the *Seibert*, as well as any other objective evidence.  *Williams*, 681 F.3d at 41.

[37]     For example, the first interview cannot accurately be said to be "complete" in that the second interview was needed in order to determine if Defendant had physically molested any children.  Moreover, Defendant's statements in second interview cannot accurately be said to "overlapped" his statements in the first interview in that the second interview asked binary questions and focused on whether he had physically molested any children.  Finally, the timing and setting of the first and second interviews cannot be accurately said to be "similar" in that, even assuming the interviews took place in the same room of the police station, they were interrupted by the polygraph examiner's advising Defendant of his rights, requiring Defendant to sign certain forms, reviewing of Defendant's background information, and reviewing of the polygraph procedure and pre-test questions.

at 44 (explaining *Seibert* is concerned with a deliberate, "focused attempt to make the defendant feel locked into his recently elicited inculpatory statements).  Indeed, Agent McDonald had already prepared the polygraph questions *before he even knew who the suspect was*.  The questions he asked during the polygraph examination (such as the username and transmitting of child pornography) would have been asked to any adult suspects independent of admissions during a first interview.  This observation is further supported by the fact that Agent McDonald did not watch or listen to the first interview.

The Court notes also that the polygraph examination, by its nature, was an interrogation different in form than the first interview, due to the testing equipment involved, the binary nature of the questions, and the different identity of the questioner.  (Dkt. No. 55 at 131.)  Moreover, Agent McDonald explained that the polygraph examination did not begin immediately when he met Defendant.  Instead, Agent McDonald first advised Defendant about the consent-to-polygraph form and the advice-of-rights form, and had Defendant sign them.  (Dkt. No. 55 at 136-38.)  Then Agent McDonald reviewed Defendant's background information, such as his education level, as well as the polygraph procedure and his pre-test questions to familiarize Defendant with the polygraph.  (Dkt. No. 55 at 150, 154-56.)  This process helped create a sufficient break in time on which to base a finding that the polygraph examination was not merely a continuation of the first interview.

As a result, the Court concludes that the objective factors, when carefully considered in their totality, tilt the scales in favor of finding that the Government did not engage in a deliberate, two-step interrogation technique.

For all of these reasons, the Court concludes that Defendant's statements during his second interview with the polygraph examiner will not be suppressed.

### E.    Defendant's Motion to Suppress Evidence

After carefully considering this matter, the Court denies Defendant's motion to suppress evidence.  The Court will address each of the issues concerning the suppression of statements in turn.

### 1.    Whether the NIT Warrant Was Supported By Probable Cause

The Court concludes that the NIT Warrant was supported by probable cause for the reasons stated by the Government in its opposition memorandum of law.  *See*, *supra*, Part II.E.2. of this Decision and Order.  To those reasons, the Court adds the following two points.

First, as far as the Court can tell, no other federal district court addressing Operation Pacifier has concluded that the NIT Warrant lacked probable cause.  The Court finds this unanimity to be a compelling reason to conclude that probable cause existed in this case.

Second, the Court finds that the logo change to Playpen's homepage is immaterial to the probable cause determination.  Notably, other district courts addressing Operation Pacifier have been unpersuaded by this argument.  *See generally United States v. Matish*, 193 F. Supp. 3d 585, 607 (E.D. Va. 2016) (concluding "the logo change lacks significance because the probable cause [determination] rested not solely on the site's logo but also on the affiant's description that the entire site was dedicated to child pornography, Playpen's suggestive name, the affirmative steps a user must take to locate Playpen, the site's repeated warnings and focus on anonymity, and the actual contents of the site"); *accord, United States v. Anzalone*, 15-CR-10347, 2016 WL 5339723, at *7 (D. Mass. Sept. 22, 2016).

### 2.    Whether the NIT Warrant Satisfied the Particularity Requirement of the Fourth Amendment

The Court finds that the NIT Warrant satisfies the particularity requirement of the Fourth Amendment for the reasons stated in the Government's opposition memorandum of law.  *See*,

*supra*, Part II.E.2 of this Decision and Order.  To those reasons, the Court adds that every other

federal district court to consider this issue has found the NIT Warrant satisfies the Fourth

Amendment's particularity requirement, and this Court finds those decisions persuasive.  Indeed,

one such court explained as follows:

> [The NIT Warrant] clearly limited which computers could be
> searched and what information could be obtained as a result of that
> search.  Attachment A of the warrant authorized deployment of the
> NIT to the computer server hosting Playpen and then to computers
> of any user or administrator who logs into [Playpen] by entering a
> username and password . . . . Attachment B, in turn, imposed
> detailed limits on what information could be obtained from those
> computers by the NIT.

 *United States v. Allain*, 15-CR-10251, 2016 WL 5660452, at *9 (D. Mass. Sept. 29, 2016)

(internal citations omitted); *see also Anzalone*, 2016 WL 5339723, at *7 (noting that "[e]very

court to consider this question has found the NIT search warrant sufficiently particular"); *accord,*

*United States v. Acevedo-Lemus*, 15-CR-0137, 2016 WL 4208436, at *7, n.4 (C.D. Cal. Aug. 8,

2016).

### 3.      Whether the NIT Warrant Was an Anticipatory Warrant that Complied with the Fourth Amendment

The Court finds that the NIT warrant was anticipatory warrant that complied with the

Fourth Amendment for the reasons stated in the Government's opposition memorandum of law.

*See*, *supra*, Part II.E.2 of this Decision and Order.  To those reasons, the Court adds only one

point.

The Court also finds persuasive a policy rationale for rejecting Defendant's argument, as

explained in *United States v. Matish*, 193 F. Supp.3d 585, 610 (E.D. Va. 2016).  In that case, the

court noted that "if it were to rule that logging into Playpen through the home page–exactly as it

was described in the [warrant] application–represented the triggering event, as opposed to ruling

that simply logging into the website represented the triggering event, such a ruling would

provide operators of websites such as Playpen with incentive to frequently change their home

pages' appearances." *Matish*, 193 F. Supp. 3d at 610.  Indeed, under this proposed ruling, "if the

FBI obtained a warrant to search computers logging into a site that the FBI had not yet taken

over, the website operator's ability to change his or her website's home page at will would

always defeat probable cause for this type of anticipatory warrant." *Id*.

### 4.      Whether a *Franks* Hearing Is Required

The Court finds that Defendant has not met his burden to show that a *Franks* hearing is

required for the reasons stated in the Government's opposition memorandum of law.  *See*, *supra*,

Part II.E.2 of this Decision and Order.

### 5.      Whether the NIT Warrant Violated Fed. R. Crim. P. 41(b) and 28 U.S.C. § 636(a)

After carefully considering the matter, the Court concludes as follows: (1) the NIT

Warrant violated Fed. R. Crim. P.  41(b) and 28 U.S.C. § 636(a); (2) however, the violation did

not amount to a constitutional violation, and instead was merely a technical violation; and (3)

furthermore, Defendant has not shown that the technical violation was deliberate or intentional,

or that he was prejudiced by the technical violation.  Therefore, the Court finds that suppression

is not the appropriate remedy.

In reviewing the other district court decisions in Operation Pacifier cases, as far as this

Court can tell, the most-recent summary concerning compliance with Fed. R. Crim. P. 41(b)

appears in *United States v. Austin*, 16-CR-0068, 2017 WL 496374, at *4 (M.D. Tenn, Feb. 2,

2017); under the circumstances, the Court finds that a brief review of that summary would be

beneficial.

Generally, the *Austin* court noted that the existing decisions of the district courts from across the country can be organized into three categories: (1) many courts determined that Fed. R. Crim. P. 41(b) was violated, or assumed that Fed. R. Crim. P. 41(b) was violated, but nevertheless concluded that suppression was not warranted; (2) several courts found that Fed. R. Crim. P. 41(b) was not violated–analogizing the NIT Warrant to a "tracking device" under Fed. R. Crim. P. 41(b)(4)–or alternatively decided that suppression was not warranted; and (3) a few courts concluded that the NIT Warrant violated Fed. R. Crim. P. 41(b), and that suppression was the appropriate remedy. *Austin*, 2017 WL 496374, at *4 (internal citations omitted.) Notably, of these thirty-one decisions (including *Austin*), only four cases ruled that suppression was the appropriate remedy.

With regard to the initial question–whether Fed. R. Crim. P. 41(b) was violated–this Court finds that Fed. R. Crim. P. 41(b) was violated for the reasons set forth in Defendant's memorandum of law. (Dkt. No. 27-1 at 33-37.) However, the Court recognizes that there are two categories of Fed. R. Crim. P. 41 violations: fundamental violations and technical violations. *United States v. Krueger*, 809 F.3d 1109, 1114-15 (10th Cir. 2015); *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992). A violation is fundamental if is of constitutional magnitude–if it violates a defendant's Fourth Amendment rights. *Krueger*, 809 F.3d at 1114; *see also United States v. Filippi*, 15-CR-0133, 2015 WL 5789846, at *6 (N.D.N.Y. Sept. 9, 2015) ("Only a fundamental violation of Rule 41 requires automatic suppression, and a violation is fundamental only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards.") [*citing United States v. Johnson*, 660 F.2d 749, 753 (9th Cir. 1981)].

Here, the Court finds that the violation of Fed. R. Crim. P. 41(b) was not a fundamental violation because it did not violate the Fourth Amendment.  As discussed above, the NIT Warrant complied with the requirements of the Fourth Amendment, namely that it was supported by probable cause and satisfied the particularity requirements.[38]  The Court agrees with the Government that Defendant had no reasonable expectation of privacy in his IP address, which further supports its conclusion that the violation was not of a constitutional magnitude.  *See*, *supra*, Part II.E.2 of this Decision and Order.[39]  Therefore, the Court holds that the violation of Fed. R. Crim. P. 41 in this case does not rise to the level of a fundamental violation, but rather is merely a technical violation.[40]

---

[38]     Courts in other Operation Pacifier cases have concluded that the violation was non-fundamental on these grounds.  *See United States v. Jean*, 15-CR-50087, 2016 WL 4771096, at *17-18 (W.D. Ark. Sept. 13, 2016) ("[I]f there was any violation of [Rule 41] at all, it was certainly non-fundamental.  The search was constitutionally sufficient in that it was supported by probable cause and satisfied the particularity requirement."); *United States v. Torres*, 16-CR-0285, 2016 WL 4821272, at *7 (W.D. Tex. Sept. 9, 2016) ("Here, the violation of Rule 41(b)(4) did not have a [c]onstitutional dimension; the FBI sought and obtained a series of warrants based on probable cause."); *United States v. Henderson*, 15-CR-0565, 2016 WL 4549108, at *4 (C.D. Cal. Aug, 8, 2016) (concluding "[t]he NIT Warrant's violation of Rule 41 is merely technical because the Warrant complies with the Fourth Amendment requirements of probable cause and particularity").

[39]     Other district courts have held that the Fed. R. Crim. P. 41 violation in the NIT Warrant was not a fundamental one because the defendant did not have a reasonable expectation of privacy in his IP address.  *See United States v. Acevedo-Lemus*, 15-CR-0137, 2016 WL 4208436, at *7 (C.D. Cal. Aug. 8, 2016) (holding that "no violation of a 'constitutional magnitude' has occurred here because [d]efendant had no reasonable expectation of privacy in his IP address).  Indeed, in *United States v. Werdene*, the court concluded that the defendant had no reasonable expectation of privacy in his IP address because he was aware his IP address had been conveyed to a third party, which negated any subjective expectation of privacy in that information.  *United States v. Werdene*, 188 F. Supp.3d 431, 444-45 (E.D. Pa. 2016).  Furthermore, the court said that even if the defendant could argue that he had a subjective expectation of privacy because of the anonymity of the Tor network, that expectation is not one that society is prepared to recognize as reasonable.  *Werdene*, 188 F. Supp.3d at 445.

[40]     In so holding, the Court rejects Defendant's argument that the violation was fundamental because the U.S. magistrate judge lacked statutory authority to issue the warrant. (Dkt. No. 27-1 at 38-40.)

The Court further finds that the technical violation of Fed. R. Crim. P. 41 does not warrant suppression in this case.[41]  The Court finds that the FBI did not intentionally or deliberately violate Fed. R. Crim. P. 41 for the reasons stated in the Government's opposition memorandum of law.  (Dkt. No. 34 at 48-49.)[42]  The Court also finds that Defendant was not prejudiced by the violation of Fed. R. Crim. P. 41 for the reasons stated in the Government's opposition memorandum of law.  (Dkt. No. 34 at 49-51.)

For all of these reasons, the Court concludes that, despite the technical violation of Fed. R. Crim. P.  41 and § 636(a), suppression is not the appropriate remedy.

### 6.      Whether, in the Alternative, the Good-Faith Exception Applies

Alternatively, the Court finds that, even if the technical violation of Fed. R. Crim. P. 41(b) did prejudice Defendant, or even if the violation of Fed. R. Crim. P. 41(b) was deemed fundamental, the good-faith exception to the exclusionary rule would apply and suppression would not be warranted.  The Court renders this finding for the reasons stated in the Government's opposition memorandum of law.  *See*, *supra*, Part II.E.2 of this Decision and Order.[43]

---

[41]      The Second Circuit has explained that a technical violation of Fed. R. Crim. P. 41 "should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."  *United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir. 1993) (*citing United States v. Burke*, 517 F.2d 377, 386-87 [2d Cir. 1975]); *accord*, *Filippi*, 2015 WL 5789846, at *6.

[42]      *See also Acevedo-Lemus*, 2016 WL 4298436, at *7 ("The fact that courts are presently divided over whether the NIT Warrant even violated Rule 41 is compelling evidence that the FBI did not intentionally and deliberately violate that Rule by seeking the warrant in the first instance.").

[43]      However, the Court does not find that the NIT search was justified by exigent circumstances (as argued by the Government) for the reasons stated in Defendant's reply memorandum of law.  *See*, *supra*, Part II.E.3 of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to dismiss the Indictment (Dkt. No. 23) is

**<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion for a bill of particulars (Dkt. No. 24) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion to compel discovery (Dkt. No. 25) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion to suppress statements (Dkt. No. 26) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion to suppress evidence (Dkt. No. 27) is **<u>DENIED</u>**.

Dated: May 15, 2017
    Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge